# EXHIBIT B

# PAPA JOHN'S

# FRANCHISE AGREEMENT

# STANDARD RESTAURANT

Franchisee: _____

Address: _____

_____

## TABLE OF CONTENTS

Page

RECITALS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1.   Grant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

2.   Term, Renewal and Expiration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

3.   Franchise Fees and Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

4.   Franchisor Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

5.   Territorial Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

6.   Premises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

7.   Proprietary Marks; Copyright . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

8.   Advertising . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

9.   Telephone Number . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

10.  Construction, Design and Appearance; Equipment . . . . . . . . . . . . . . . . . . . 17

11.  Operations; Standards of Quality; Inspections . . . . . . . . . . . . . . . . . . . . . . 22

12.  Products; Commissary; Menu . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

13.  Accounting and Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

14.  Transfers; Our Right of First Refusal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

15.  Death, Incapacity or Dissolution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

16.  Your Additional Covenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

17.  Trade Secrets and Confidential Information . . . . . . . . . . . . . . . . . . . . . . . . 33

18.  Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

19.  Termination by Us . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

20.    Obligations upon Termination or Expiration  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    37

21.    Independent Contractor; Indemnification  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    40

22.    Your Representations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    41

23.    ENFORCEMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    42

24.    Notices  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    45

25.    Miscellaneous  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    46

EXHIBIT A — ADDENDUM TO LEASE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    A-1

EXHIBIT B — ASSIGNMENT OF TELEPHONE NUMBERS AND LISTINGS  . . . .    B-1

# PAPA JOHN'S

# FRANCHISE AGREEMENT

# SINGLE LOCATION FRANCHISE

**THIS FRANCHISE AGREEMENT** ("Agreement") is made this \_\_\_\_\_ day of _____, 20\_\_\_ (the "Effective Date"), by and between **PAPA JOHN'S INTERNATIONAL, INC.**, a Delaware corporation ("we", "us" or "Papa John's"), and _____, a _____ ("you"). If you are a corporation, limited liability company, partnership or other business entity, certain provisions of the Agreement also apply to your owners and will be noted.

## RECITALS:

**A.**     We and our Affiliates have expended time, money and effort to develop a unique system for operating retail restaurants devoted primarily to carry-out and delivery of pizza and other food items.  The chain of current and future Papa John's restaurants is referred to as the "Papa John's Chain" or the "Chain."

**B.**     The Chain is characterized by a unique system which includes:  special recipes and menu items; distinctive design, decor, color scheme and furnishings; software and programs; standards, specifications and procedures for operations; procedures for quality control; training assistance; and advertising and promotional programs; all of which we may improve, amend and further develop from time to time (the "System").

**C.**     We identify our goods and services with certain service marks, trade names and trademarks, including, but not limited to, "Papa John's," "Papa John's Pizza" and "Pizza Papa John's and Design" (the Papa John's Logo) as well as certain other trademarks, service marks, slogans, logos and emblems that have been or may be designated for use in connection with the System from time to time (the "Marks").

**D.**     You now desire to enter into this Agreement regarding the operation of one Papa John's restaurant under the System and the Marks at the location listed below (the "Restaurant").

**E.**     We have agreed to grant you a franchise for the Restaurant on the terms and conditions of this Agreement.

**NOW, THEREFORE,** the parties agree as follows:

1.   **Grant.**   Subject to the terms and conditions of this Agreement and your continuing faithful performance, we hereby grant to you the non-exclusive right and franchise (the "Franchise") to operate a retail restaurant under the System and the Marks to be located at:

_____

_____

(the "Location")

Pursuant to this grant, you, at your own expense, shall construct or remodel, and equip, staff, open and operate the Restaurant at the Location.  Unless otherwise agreed in writing by us, you shall commence operating the Restaurant within 60 days after the Effective Date of this Agreement and you shall diligently operate such business in accordance with this Agreement for the Term (defined below).  Approval of the Location by us does not constitute an assurance, representation or warranty of any kind, expressed or implied, as to:  (i) the suitability of the Location for a Papa John's Restaurant; (ii) the successful operation of the Restaurant; or (iii) for any other purpose.  Our approval of the Location indicates only that we believe it complies with acceptable minimum criteria that we establish solely for our purposes at the time of the evaluation.

2.   **Term, Renewal and Expiration.**

(a)   **Initial Term.**   The Franchise shall be for a term of 10 years from the Effective Date of this Agreement, unless terminated earlier as provided in this Agreement (the "Initial Term").

(b)   **Term.**   As used in this Agreement, "Term" shall mean the Initial Term, the Renewal Term or any extension of either of them, as the case may be.

(c)   **Renewal of Franchise.**   This Agreement shall not automatically renew upon the expiration of the Initial Term.  You shall, however, have an option to renew the Franchise upon the expiration of the Initial Term.  You may renew the Franchise for one additional 10 year term (the "Renewal Term") if, and only if, each and every one of the following conditions has been satisfied:

(i)   You must give us written notice of your desire to renew the Franchise not less than 3 months nor more than 6 months prior to the end of the Initial Term, provided that if we have not received notice from you of your desire to renew within such period, we will notify you and you shall have a period of 10 days thereafter within which to submit the renewal notice.

(ii)   You must be in full compliance with this Agreement and there must not be any uncured default by you under this Agreement; there has been no series of defaults by you during the Initial Term (i.e., an abnormal frequency of defaults or a default that has occurred repeatedly, or a combination thereof), whether or not such defaults were cured; all your debts and obligations to us and our Affiliates under this Agreement or otherwise must

be current; and your obligations to the Marketing Fund and each Cooperative (defined below) of which you are a member must be current.

       (iii)    You must execute and deliver to us, within 10 days after delivery to you, the form of Papa John's Franchise Agreement being offered to new franchisees on the date you give the notice under this Section, including all exhibits and our other then-current ancillary agreements, which agreements shall supersede this Agreement and all ancillary agreements in all respects, and the terms and conditions of which may differ substantially from this Agreement; provided that such Franchise Agreement shall provide for a term of 10 years.

       (iv)    You must secure the right to continue possession of the Premises for a period at least equal to the Renewal Term or, alternatively, you must secure premises at another location that we approve for the same period.

       (v)    Your Principal Operator (defined below) and manager must attend and successfully complete our training program for new franchisees.

       (vi)    We are then continuing to offer Papa John's Pizza franchises in the state in which the Restaurant is located and have all required documents filed and all necessary approvals to offer Papa John's franchises in that state.

       (vii)    You must pay us a renewal fee of $3,000.

       (viii)    You must execute and deliver to us a general release, in the form we prescribe, releasing, to the fullest extent permitted under the laws of the state where the Restaurant is located, all claims that you may have against us and our Affiliates and subsidiaries, and their respective officers, directors, shareholders and employees in both their corporate and individual capacities.

       (ix)    You must make, or provide for in a manner reasonably satisfactory to us, such renovation and re-equipping of the Restaurant as may be necessary or appropriate to reflect the then-current standards and image of the System, including, without limitation, renovation or replacement of signs, equipment, furnishings, fixtures and decor; provided that substantial renovation and re-equipping shall not be required if you have substantially renovated the Restaurant within the 3-year period immediately preceding the end of the Initial Term.

      **(d)**    <u>**Expiration.**</u>  Renewal of the Franchise after the Initial Term shall not constitute a renewal or extension of this Agreement, but shall be conditioned upon satisfaction of the above provisions.  Upon expiration of the Renewal Term, further renewal rights will be governed by the Franchise Agreement executed by you upon expiration of the Initial Term.  If you fail to meet any of the conditions under Section 2.(c) above with respect to the renewal of the Franchise, the Franchise shall automatically expire at the end of the Initial Term.

3.      **Franchise Fees and Payments.**

(a)     **Initial Franchise Fee and Royalties.**  In consideration of the grant of the Franchise, you agree to pay us the following fees:

(i)      an Initial Franchise Fee of $25,000, which shall be paid upon the execution of this Agreement and which shall be deemed fully earned and is non-refundable;

(ii)     a continuing royalty (the "Royalty") of 4% of the "Net Sales" of the Restaurant for each "Period" (as defined in Section 13.(b)); provided that any time, we may increase the Royalty to 5% of Net Sales for the remainder of the Initial Term and the Renewal Term, if applicable.  However, we may increase the Royalty only if our form of Franchise Agreement being offered to new Papa John's franchisees at the time of the increase provides for a Royalty of 5%.  Net Sales shall mean the gross revenues of the Restaurant from sales of approved products and provision of approved services (whether such sales are evidenced by cash, check, credit, charge account or otherwise), less sales tax collected on such sales and paid to the State or other local taxing authority.  The Royalty is due on the 10th day of the month following each Period; and

(iii)    a continuing internet transaction fee ("On-line Fee") of 3% of each Period's Net Sales of the Restaurant that arise from customer orders received via the internet through our on-line ordering system.  We may increase the On-line Fee to as much as 7% of Net Sales, provided, we may not increase the On-line Fee more than once in any 12-month period. The On-line Fee is due concurrently with the Royalty.

(b)     **Papa Card Fees.**  You are required to accept customer cash cards ("Papa Card(s)") administered by Papa Card, Inc., a subsidiary of the Papa John's Marketing Fund, Inc. (the "Marketing Fund"), which is described further in Section 8.(b).  We will debit or credit your bank account on a weekly basis for the net amount of Papa Card purchase or redemption transactions.  Upon redemption of a Papa Card balance, or portion thereof, for purchases from your Restaurant, you shall pay 2% of the amount of Papa Card redemption transactions, including tax and gratuities, to Papa Card, Inc. on a monthly basis.  We will debit your bank account monthly for the amount of Papa Card transaction fees.  This fee may be increased to 3.5% of Papa Card redemption transactions.  The fee may be increased to a rate greater than 3.5% only if approved by the members of the Marketing Fund.

(c)     **Taxes.**  If the state in which the Restaurant is located (or a local taxing authority within the state) imposes a sales tax, use tax, gross receipts compensating tax or similar tax on the Initial Franchise Fee, the Royalty or the On-Line Fee, we will collect such tax from you in addition to the amount set forth or determined as provided herein and remit the amount of the tax directly to the taxing authority.  This does not include income taxes imposed on us, for which we are solely responsible.

(d)     **Payments.**  Prior to the opening of the Restaurant (and thereafter as requested by us), you shall execute and deliver to us, our bank(s) and your bank, as necessary, all forms and documents that we may request to permit us to debit your bank account, either by

-4-

check, via electronic funds transfer or other means utilizing the "Information System" (as defined in Section 10.(d)) or by such alternative methods as we may designate ("Payment Methods"). You must comply with all procedures specified by us from time to time, and/or take such reasonable actions as we may request to assist in any of the Payment Methods. We may use the Payment Methods to collect the amount of each Period's Royalty, On-line Fee and any other amounts due to us, our Affiliates, the Papa John's Marketing Fund, Inc. or Papa Card, Inc. under this Agreement or otherwise, including, but not limited to, amounts owed to us and/or our Affiliates in connection with: (i) "Marketing Fund" contributions (as defined in Section 8.(b)); (ii) purchases from "PJFS" (as defined in Section 12.(b)), Preferred Printing & Promotions, Inc. and all of our other Affiliates; and (iii) Papa Card purchase and balance increase transactions by customers. The Royalty, On-line Fee, Marketing Fund contributions and Papa Card collections will be debited on the 10th of each month, or if the 10th falls on a weekend or bank holiday, then on the next business day. Payments to PJFS will be debited one business day after products are delivered to the Restaurant. We will determine your Net Sales for each Period via the Information System, or if we are unable to do so, you shall report your Net Sales in writing on or before the 7th day of the month following each Period. Such reporting shall be in addition to all other reporting requirements under Section 13. If you fail to report Net Sales on a timely basis, we may estimate the Net Sales of the Restaurant for such Period and debit your bank account the amount of the Royalty, On-line Fee and Marketing Fund contribution based on such estimate. If an estimate results in an overpayment, we shall deduct the amount of the overpayment from the next Period's Royalty, On-line Fee and Marketing Fund contribution. Any deficiency resulting from such estimate may be added to the next Royalty, On-line Fee and/or Marketing Fund contribution payment(s) due and debited against your bank account. If, at any time, we determine that you have underreported the Restaurant's Net Sales, or underpaid any Period's Royalty, On-line Fee, Marketing Fund contributions or payments to any of our Affiliates, we are authorized to immediately debit your account for these amounts by any of the Payment Methods. You shall notify us at least 20 days prior to closing or making any change to the account against which such debits are to be made. If such account is closed or ceases to be used, you shall immediately provide all documents and information necessary to permit us to debit the amounts due from an alternative account. You acknowledge that these requirements are only a method to facilitate prompt and timely payment of amounts due and shall not affect any obligation or liability for amounts owed. If for any reason your account cannot be electronically debited, you shall submit payments by wire transfer or check (certified or cashier's check if requested by us) on or before the dates when due. You shall indemnify and hold us harmless from and against all damages, losses, costs and expenses resulting from any dishonored debit against your account, regardless whether resulting from the act or omission of you or your bank; provided that you shall not be obligated to indemnify us for any dishonored debit caused by our negligence or mistake. Notwithstanding the commencement of any "Insolvency Proceeding" (as defined in Section 25.(a)) by or against you, you shall comply with the Payment Methods described above, and shall use your best efforts to obtain court approval of the Payments Methods as may be necessary or otherwise requested by us, and you agree to seek such court approval as expeditiously as possible, but in no event later than five (5) business days after the commencement of such Insolvency Proceeding.

4.      **Franchisor Services.** During the Term, we agree to provide to you the following services:

     **(a)**     specifications for the design of the Restaurant and related facilities to be used in the operation of the Restaurant;

     **(b)**     specifications for fixtures, furnishings, decor, communications and computer hardware and software, signs and equipment;

     **(c)**     the names and addresses of designated and approved suppliers, and standards and specifications for (i) all food products, beverages, ingredients and cooking materials sold from or used in the operation of the Restaurant, and (ii) all containers, boxes, cups, packaging, menus, uniforms and other products and materials used in connection with the operation of the Restaurant;

     **(d)**     a pre-opening management training program for the "Principal Operator" (as defined in Section 11) and one or more managers approved by us, and such other persons as we may reasonably designate, and such other training for your employees at the locations and for such periods as we may designate from time to time, provided that you shall be responsible for all expenses incurred by such persons in connection with training, including, without limitation, all costs of travel, lodging, meals and wages;

     **(e)**     our supervision and periodic inspections and evaluations of your operation, as described more fully in Section 11.(j), which supervision, inspections and evaluations shall be conducted at such times and in such manner as we shall reasonably determine;

     **(f)**     communication to you of information relating to the operation of a Papa John's restaurant to the extent we deem it necessary or pertinent; and

     **(g)**     operation of the on-line ordering system, which enables customers to place orders on-line via internet access to our website.

     **5.**     **Territorial Provisions.**

     **(a)**     **Territory.**  Subject to the provisions of this Section 5, we agree that during the Term we will not locate nor license another to locate a Papa John's restaurant within **[a one and one-half mile radius of the Location OR the area bounded by _____]** (the "Territory"), except that: (i) enclosed malls, institutions (such as hospitals or schools), airports, parks (including theme parks), military bases and sports arenas (collectively "Express Locations") subject to exclusive food vending rights of third parties shall be excluded from protection within the Territory; and (ii) we may open Papa John's restaurants, or franchise the right to open Papa John's Express restaurants to other persons at any such Express Locations, regardless of where they are located.  No delivery services will be permitted from Express Location restaurants unless otherwise agreed by you and us.  If this Agreement is signed pursuant to a Development Agreement between you and us, in no event shall the Territory extend outside the boundaries of the "Development Area" as defined in the Development Agreement and neither termination nor expiration of the Development Agreement shall alter this limitation.  We do not warrant or represent that no other Papa John's restaurant will solicit or make any sales within the Territory, and you expressly acknowledge and agree that such

solicitations or sales may occur within the Territory. We shall have no duty to protect you from any such sales, solicitations, or attempted sales. You recognize and acknowledge that: (i) you will compete with other Papa John's restaurants that are now, or that may in the future be, located near or adjacent to your Territory; and (ii) that such Papa John's restaurants may be owned by us, our Affiliates or third parties. You acknowledge and agree that if you relocate the Restaurant, the Territory in our sole discretion may be reduced, changed, altered or restricted (i.e., we make no assurance that the Territory specified herein will be applicable to the new location, even though we have approved the new location).

(b)     **Other Businesses.**  You understand and agree that we reserve the right, either directly and/or through Affiliates, to operate, franchise, or license others to operate or franchise, restaurants or other food related establishments or businesses other than Papa John's restaurants and you agree that we and our Affiliates may do so within the Territory; provided, that such restaurants or food establishments or businesses do not sell pizza on a delivery basis, or primarily on a carry-out basis. We also reserve the right to develop, market and conduct any other business under the Marks or any other trademark.

(c)     **Other Methods of Distribution.**  We also reserve the right, directly or through third parties, to manufacture or sell, or both, within and outside your Territory, pizza and other products that are the same as or similar to those sold in Papa John's restaurants using brand names that are the same as or similar to the Marks, through any channel of distribution; provided that such items are not sold through restaurants or on a ready-to-eat basis.

6.     **Premises.**

(a)     **Leased Premises.**  If you intend to lease the premises where the Restaurant will be operated (the "Premises"), you shall submit to us copies of the executed signature pages of all such leases immediately after signing and copies of the full leases and any exhibits and addendum at such other times as we may request. The term of all leases plus all options for you to renew shall together equal or exceed the Term. All leases pertaining to the Premises shall also include an Addendum in the form of Exhibit A attached hereto, or shall contain terms and conditions that we approve as substantially similar to those contained in **Exhibit A**. A copy of the executed Addendum must also be submitted to us.

(b)     **Owned Premises.**  If you intend to own the Premises, you shall furnish to us proof of ownership prior to the date you begin any construction, build-out or remodeling of the Premises. If you decide to sell the Premises at any time prior to the expiration or termination of the Franchise Agreement, you must notify us of your intention. We shall have a right of first refusal to purchase the Premises on the same terms and conditions as set forth in Section 14.(b)(i). If the sale will also involve a relocation of the Restaurant, you shall submit to us for our approval your proposed plans (including copies of any proposed lease or contract of purchase) for an alternate location.

(c)     **Premises Identification.**  Regardless of whether you own or lease the Premises, you must, within ten days after the expiration or termination of the Franchise Agreement, remove all signs and other items and indicia that serve, directly or indirectly, to identify

the Premises as a Papa John's restaurant and make such other modifications as are reasonably necessary to protect the Marks and the Papa John's System, and to distinguish the Premises from Papa John's restaurants. To enforce this provision, we may pursue any or all remedies available to us under applicable law. Your obligation shall be conditioned upon our giving you prior notice of the modifications to be made and the items removed.

(d) **Suitability of Premises.** Regardless of whether the Premises are owned or leased, it shall be your responsibility to determine that the Premises can be used, under all applicable laws and ordinances, for the purposes provided herein and that the Premises can be constructed or remodeled in accordance with the terms of this Agreement and you shall obtain all permits and licenses that may be required to construct, remodel and operate the Restaurant. You agree that the Premises will not be used for any purpose other than the operation of the Restaurant in compliance with this Agreement.

(e) **Relocation; Assignments.** You shall not, without first obtaining our written consent: (i) relocate the Restaurant; or (ii) renew or materially alter, amend or modify any lease, or make or allow any transfer, sublease or assignment of your rights under any lease or owned location pertaining to the Premises. Such consent shall not be unreasonably withheld. You agree to give us notice not less than 30 days prior to any of the foregoing. We may require you to relocate the Restaurant to another location upon: (A) expiration of the original term or any extension or renewal of your lease; (B) expiration of the Initial Term or Renewal Term of this Agreement; or (C) any significant damage to the Premises or surrounding areas, or other event, that would provide you with an option or right to terminate the lease. You agree to give us notice not less than 60 days prior to the expiration of your lease, and to give us written notice within five days after the occurrence of any event covered by (C) above. Our right to require you to relocate shall not be exercisable during the first two years of the Initial Term, and thereafter shall be conditioned upon: (1) the availability of a location approved by us for such relocation; (2) our offering to extend the Term of this Agreement for not less than five years, or at our option, offering to enter into our then-current form of franchise agreement (which shall include an initial term of not less than 10 years); and (3) the Territory (as measured from the new location) not extending into the "Territory" of any other Papa John's Pizza franchisee. YOU ACKNOWLEDGE THAT SUCH RELOCATION, IF REQUIRED, WOULD INVOLVE SUBSTANTIAL ADDITIONAL INVESTMENT BY YOU DURING THE TERM OF THIS AGREEMENT, AND MAY INCLUDE, WITHOUT LIMITATION, AN OBLIGATION TO LEASE OR BUY LAND, CONSTRUCT A FREE-STANDING BUILDING, INSTALL LEASEHOLD IMPROVEMENTS AND/OR PURCHASE NEW EQUIPMENT AND SIGNAGE.

7. **Proprietary Marks; Copyright.**

(a) **Ownership of Copyrights.** You acknowledge and agree that: (i) we may authorize you to use certain copyrighted or copyrightable works (the "Copyrighted Works"), including the Manuals and the "Proprietary Programs" (as defined in Section 10.(c)(i)(B)); (ii) the Copyrighted Works are the valuable property of us; and (iii) your rights to use the Copyrighted Works are granted to you solely on the condition that you comply with the terms of this Agreement. You acknowledge and agree that we will further create, acquire or obtain

licenses for certain copyrights in various works of authorship used in connection with the operation of the Restaurant, all of which shall be deemed to be Copyrighted Works under this Agreement.  Such Copyrighted Works include, but are not limited to, the materials and information provided to you by us for use in the operation of the Proprietary Programs.  You shall not undertake to patent, copyright or otherwise assert proprietary rights to the Proprietary Programs or any data generated by the use of the Proprietary Programs or any portion thereof. Copyrighting of any material by us  shall not be construed as causing the material to be public information.  You will cause all copies of the Proprietary Programs and any data in your possession generated by use of the Proprietary Programs to contain an appropriate copyright notice or other notice of proprietary rights specified by us.  All data provided by you, uploaded to our system from your system, and/or downloaded from your system to our system is and will be owned exclusively by us, and we will have the right to use that data in any manner that we deem appropriate without compensation to you.

       **(b)**    **Ownership; Use by Others.**  You agree that we are the sole and exclusive owner of:  (i) the Marks and all goodwill associated with or generated by use of the Marks; (ii) the Copyrighted Works; and (iii) any and all data generated by use of the Copyrighted Works. You agree that all works of authorship related to the System that are created in the future will be owned by, or licensed to, us or our Affiliates.  Your use of the Copyrighted Works and the Marks does not vest you with any interest therein other than the non-exclusive license to use the Copyrighted Works and Marks granted in this Agreement.  You shall execute any documents that we or our counsel deem necessary for the protection of the Copyrighted Works or the Marks or to maintain their validity or enforceability, or to aid us in acquiring rights in or in registering any of the Marks or any trademarks, trade names, service marks, slogans, logos or emblems that we subsequently adopt.  You shall give notice to us of any knowledge that you acquire concerning any actual or threatened infringement of the Copyrighted Works or the Marks, or the use by others of names, marks or logos that are the same as or similar to the Marks.  You shall cooperate with us in any suit, claim or proceeding involving the Marks or the Copyrighted Works or their use to protect our rights and interests in the Marks or the Copyrighted Works.  We, in our sole discretion, shall control all decisions concerning the Marks or the Copyrighted Works.

       **(c)**    **Use of Marks.**  You shall use the Marks only in connection with the operation of the Restaurant at the Location specified herein, and shall use them only in the manner that we authorize.  Your right to use the Marks is limited to use during the Term of this Agreement and in compliance with specifications, procedures and standards prescribed by us from time to time.  You shall prominently display the Marks in the manner that we prescribe on all signs, plastic and paper products, and other supplies and packaging materials that we designate.  You shall not fail to perform any act required under this Agreement, or commit any act that would impair the value of the Marks or the goodwill associated with the Marks.  You shall not at any time engage in any business or market any product or service under any name or mark that is confusingly or deceptively similar to any of our Marks.  You shall not use any of the Marks as part of your corporate or trade name, or as part of any e-mail address, web-site address, domain name, or other identification of your business in any electronic medium.  You shall not use any trademark, trade name, service mark, logo, slogan or emblem that we have not authorized for use in connection with the Restaurant, including without limitation, any co-

-9-

branding or cross-promotional efforts containing the name, trademark, service mark, logo or emblem of any third party without our approval.  You shall obtain such fictitious or assumed name registrations as required by applicable state law and forward to us copies of the same upon request.

        **(d)**     **Designation as You.**  You shall identify yourself as the owner of the Franchise in conjunction with the use of the Marks, including, without limitation, on checks, invoices, receipts, letterhead and contracts, as well as at conspicuous locations on the Premises in a form that specifies your name, followed by the phrase "an independently owned and operated franchise" or such other phrase as we direct.

        **(e)**     **Discontinuance of Use; Additional Marks and/or Copyrights.**  You shall modify or discontinue use of any Mark or Copyrighted Work if a court of competent jurisdiction orders it, or if we in our sole discretion deem it necessary or advisable.  You shall comply with our directions regarding any such Mark or Copyrighted Work within 30 days after receipt of notice from us.  You shall also use such additional or substitute Marks or Copyrighted Works as we shall direct.  We shall not be obligated to compensate you for any costs or expenses incurred by you to modify or discontinue using any Mark or Copyrighted Work or to adopt additional or substitute Copyrighted Works or Marks.

     **8.**     **Advertising.**

        **(a)**     **Contributions and Expenditures.**  Recognizing the value of advertising and the importance of the standardization of advertising to the furtherance of the goodwill and public image of the System, we and you agree as follows:

        **(i)**     **Monthly Contributions and Expenditures.**  Each month during the Term, you shall make the following contributions and expenditures for advertising:

        **(A)**     Subject to the limitations set forth in Subsection (D) and Section 8.(a)(ii)(A) below, you shall contribute to the Marketing Fund such amount as the Board of Directors of the Marketing Fund (the "Board") may designate from time to time.

        **(B)**     Subject to the limitations set forth in Subsection (D) and Section 8.(a)(ii)(B) below, you shall contribute to the "Cooperative" (as defined below) that percentage of Net Sales that the governing body of the Cooperative may designate from time to time, which amount shall not be less than 2% of the monthly Net Sales of the Restaurant, except as set forth in Section 8.(a)(ii)(B) below.

        **(C)**     Subject to the limitations set forth in Subsection (D) below, you shall expend such amounts as we in our sole discretion may designate from time to time for local store marketing and advertising.

        **(D)**     The aggregate amount that you may be required to spend on your Marketing Fund contributions, Cooperative contributions and local store

marketing and advertising (the sum of (A), (B) and (C), above), shall not exceed 7.5% of the Net Sales of the Restaurant, unless your Cooperative has elected a contribution rate in excess of 2% of the monthly Net Sales of the Restaurant.  In that case, your maximum required expenditures will be 7.5% of the monthly Net Sales of the Restaurant, plus the amount by which your Cooperative contribution rate exceeds 2% of monthly Net Sales of the Restaurant.

#### (ii)    Increases in Contributions.

(A)    **Marketing Fund Contributions.**  The Board may increase the maximum required contribution to the Marketing Fund to 2½% of Net Sales, provided such increase is approved by the owners of not less than 60% of the Papa John's restaurants required to contribute to the Marketing Fund (including both Franchisor-owned and franchised Papa John's restaurants).  Any increase in the required contribution to the Marketing Fund in excess of 2½% of Net Sales must be approved by not less than 2/3 of the restaurants required to contribute to the Marketing Fund (including Papa John's restaurants that we own and franchises).

(B)    **Cooperative Contributions.**  We may approve a monthly contribution rate to the Cooperative of less than 2% of Net Sales, provided, we also reserve the right to withdraw our approval of any such reduced contribution rate to the Cooperative and require that the minimum 2% contribution rate be reinstated.  The governing body of the Cooperative may increase the required contribution to the Cooperative to a percentage of Net Sales in excess of 5%, provided that any such increase is approved by not less than two-thirds of the Papa John's restaurants required to contribute to the Cooperative (including both Franchisor-owned and franchised restaurants).  We also have the right to authorize any Cooperative to determine contributions on a different basis (fixed amount, geographic location, etc.).  Our decision on any issue concerning Cooperative contributions shall be final.

(b)    **Marketing Fund.**  Papa John's Marketing Fund, Inc., a Kentucky nonstock, nonprofit corporation (the "Marketing Fund"), has been organized for the purposes set forth in the Articles of Incorporation and By-Laws of the Marketing Fund, as they may be amended from time to time.  You shall automatically become a non-voting member of the Marketing Fund upon the execution of this Agreement, and prior to the opening of the Restaurant you shall execute and deliver to the Marketing Fund an Advertising Agreement in the form prescribed by the Board.

(i)    You agree and acknowledge that the Marketing Fund is intended to increase recognition of the Marks and to further the public image and acceptance of the System and that we, the Marketing Fund and the directors of the Marketing Fund do not under-take any obligation to ensure that expenditures by the Marketing Fund in or affecting any geographic area are proportionate or equivalent to contributions to the Marketing Fund by Papa John's restaurants operating in such geographic area or that you or the Restaurant will benefit directly or in proportion to your contribution to the Marketing Fund.  We, our officers, directors, agents and employees shall not be deemed a fiduciary or trustee of the contributions

to, or the assets of, the Marketing Fund.  We, the Marketing Fund and our respective officers, directors, agents and employees shall not be liable to you with respect to the maintenance, direction or administration of the Marketing Fund, including without limitation, with respect to contributions, expenditures, investments and borrowings, except for acts constituting willful misconduct.

(ii)     We and our Affiliates shall make contributions to the Marketing Fund for each Papa John's restaurant that we own on the same basis as required of comparable franchisees within the System.

(iii)    As long as you are in compliance with the Advertising Agreement and the Articles and By-Laws of the Marketing Fund, you will be furnished with advertising materials produced by or for the Marketing Fund for System-wide distribution on the same terms and conditions as such materials are furnished to other franchisees.

(iv)    You shall make your monthly contribution to the Marketing Fund on the date and in the manner provided for in the Advertising Agreement and the By-Laws and shall submit such statements and reports as the Board may designate from time to time.  From time to time the Board may designate one or more accounts to which such contributions shall be made and if requested or directed by the Marketing Fund, you shall make such payments separately.  Contributions to the Marketing Fund may be used to defray our expenses only to the extent of the administrative costs and overhead that we may reasonably incur in rendering services to the Marketing Fund.

(v)     The funds collected by the Marketing Fund, and any earnings thereon, are not and shall not be our asset or the asset of any franchisee.

(vi)    Although the Marketing Fund is intended to be of perpetual duration, the Board has the right to terminate the Marketing Fund.  However, the Marketing Fund shall not be terminated until all monies held by it have been expended for the purposes set forth in its Articles of Incorporation and By-Laws or distributed as permitted by law.

(vii)   As a member of the Marketing Fund, you will also be entitled to one vote per Restaurant that you own or control on certain increases of Papa Card transaction fees, as described in Section 3.(b).

(c)     **Regional Cooperative Advertising.**  You agree that we shall have the right, in our sole discretion, to designate from time to time a geographical area in which the Restaurant is located for the purpose of establishing an advertising cooperative (the "Cooperative").  If a Cooperative has been established applicable to the Restaurant at the time you commence operations, you shall immediately become a member of such Cooperative.  If a Cooperative applicable to the Restaurant is established at any later time during the Term, you shall become a member of such Cooperative no later than 30 days after the date on which the Restaurant commences operation.  In no event shall the Restaurant be required to contribute to more than one Cooperative.  We may designate, from time to time, a formula for calculating a proration or reduction of the contribution rate for Papa John's restaurants in a Cooperative

based on media coverage, demographics or other factors.  The following provisions shall apply to each Cooperative:

(i)     Each Cooperative shall be organized and governed in a form and manner conforming to applicable state law, and shall commence operation on a date that we approve.  On all matters to be voted on by the Cooperative's membership, each member shall have one vote for each Papa John's restaurant it owns.

(ii)    Each Cooperative shall be organized for the purposes of producing and conducting general advertising programs and activities for use in and around the applicable geographic area and developing standardized promotional materials for use by the members.

(iii)   We shall make contributions to each Cooperative of which we are a member on the same basis as required of comparable Papa John's restaurant franchisees within the System.

(iv)    No advertising programs or materials may be used by the Cooperative or furnished to its members, and no advertising or promotional activities may be conducted by the Cooperative, without our prior written approval.  All such programs, materials and planned activities shall be submitted to us for approval in accordance with the procedure set forth below.  A Cooperative may employ only advertising agencies that have been approved by us.

(v)     Subject to the provisions above, each Cooperative shall have the right to require its members to make contributions to the Cooperative in such amounts as are determined by the governing body of the Cooperative.

(vi)    You shall make your contributions to the Cooperative on the date and in the manner designated by the Cooperative.  You shall also submit such statements and reports as may be designated from time to time by us or the Cooperative.  The Cooperative shall submit to us such statements and reports as we may designate from time to time.

(vii)   Notwithstanding the foregoing, we, in our sole discretion, may, upon written request of a franchisee stating reasons supporting such request, grant to any franchisee an exemption from the requirement of membership in a Cooperative.  Such an exemption may be for any length of time and may apply to one or more Papa John's restaurants owned by such franchisee.  We may also exempt one or more restaurants owned or controlled by us from the requirement of membership in a Cooperative for such periods as we reasonably deem appropriate.  Our decision concerning an exemption shall be final.

(d)     **Local Advertising.**  Subject to the limits set forth above, you agree to spend for local advertising such percentage of your Net Sales as we from time to time direct in our sole discretion.  You shall submit verification of your local advertising expenditures at such times and in such form as we request from time to time.

-13-

(i)     **Supplemental Advertising.**  You shall have the right to conduct, at your separate expense, supplemental advertising in addition to the expenditures specified herein.  All such supplemental advertising must be either prepared or previously approved by us within the 90-day period preceding their intended use, or approved by us as provided below.

(ii)     **Yellow Pages Advertising.**  You shall, at your own expense, obtain (or contribute to the cost of obtaining) a listing for the Restaurant in each "yellow pages" and other telephone directory serving the Territory and each such listing shall be of the style, format and size, and in such form, as we may specify from time to time.

(e)     **Our Approval.**  Prior to their use by the Cooperative or by you, samples of all advertising and promotional materials not prepared or previously approved by us within the 90-day period preceding their intended use, including without limitation, co-branding or cross-promotional efforts containing the name, trademark, service mark, logo or emblem or any third party, shall be submitted to us (via commercial overnight courier or through the mail return receipt requested) for our approval, to ensure consistency with the then-current standards and image of the System and protection of the Marks and the goodwill associated therewith. If disapproval is not received within 20 days from the date of receipt by us of such materials, we shall be deemed to have given the required approval.  The Cooperative and you may not use, and must cease using, any advertising or promotional materials that we may at any time disapprove, regardless whether we have previously approved any such items.

(f)     **Our Advertising.**  We may from time to time expend our own funds to produce such promotional materials and conduct such advertising as we deem necessary or desirable.  In any advertising conducted solely by or for us, we shall have the sole discretion to determine the products and geographical markets to be included, and the medium employed and we shall not have any duty or obligation to supply you with any advertising or promotional materials produced by or for us at our sole expense.

(g)     **Ownership of Advertising.**  We shall be the sole and exclusive owner of all materials and rights that result from advertising and marketing programs produced and conducted, whether by you, us, the Cooperative or the Marketing Fund.  Any participation by you in any advertising, whether by monetary contribution or otherwise, shall not vest you with any rights in the Marks employed in such advertising or in any tangible or intangible materials or rights, including copyrights, generated by such advertising.  If requested by us, you shall assign to us any contractual rights or copyright that you acquire in any advertising and execute such documents or instruments as we may reasonably require in order to implement the terms of this Section 8.(g).

(h)     **Website.**  You specifically acknowledge and agree that any Website (as defined below) shall be deemed "advertising" under this Agreement and will be subject to, among other things, Sections 8.(e) and 8.(g) above.  As used in this Agreement, the term "Website" means an interactive electronic document, contained in a network of computers linked by communications software, that you operate or authorize others to operate and that refers to the Restaurant, the Marks, us and/or the System.  The term Website includes, but is not

limited to, Internet, intranet and World Wide Web home pages and on other electronic services, such as on "America Online."  In connection with any Website, you agree to the following:

        (i)    If required by us, you shall not establish a separate Website, but shall only have one or more web page(s), as designated by us, within our Website;

        (ii)    If we approve, in writing, a separate Website for you, then each of the following provisions shall apply:

        (A)    You shall not establish or use the Website without our prior written approval.

        (B)    Before establishing the Website, you shall submit to us, for our prior written approval, a sample of the proposed Website domain name, format, visible content (including, but not limited to, proposed screen shots), and non-visible content (including, but not limited to, meta tags) in the form and manner we may reasonably require; and you shall not use or modify such Website without our prior written approval as to such proposed use or modification.

        (C)    In addition to any other applicable requirements, you shall comply with our standards and specifications for Websites as prescribed by us from time to time in the Manuals or otherwise in writing.

        (D)    If required by us, you shall establish such hyperlinks to our Website and others as we may request in writing.

The provisions of this Section 8.(h) shall also apply to Cooperatives.

**9.**    **Telephone Number.**  The only telephone number(s) assigned to the Restaurant [is/are] _____.  Upon termination or expiration of the Franchise, you shall cease using such telephone number(s).  In no event shall you use such number(s) for any other business.  You further agree that if you obtain any additional or substitute telephone service or telephone number(s) at the Restaurant, you will promptly notify us and such additional or substitute number(s) shall be subject to this Agreement.  You shall immediately take all such actions as may be necessary to transfer any telephone number and any telephone directory listings associated with the Restaurants or the Marks to us.  You acknowledge that, as between us and you, we have the sole right to and interest in all telephone numbers and directory listings associated with the Restaurants or the Marks.  Concurrently with the execution of this Agreement, you shall execute and deliver the form of assignment of telephone numbers and listings (the "**Telephone Number Assignment**"), required by the applicable local telephone company or, if the local telephone company has no form, our current blank assignment form attached to this Agreement as Exhibit B.  You acknowledge and agree that the telephone company and all listing agencies may accept this Agreement and/or the Telephone Number Assignment as conclusive evidence of our exclusive right in such telephone numbers and directory listings and its authority to direct their transfer.

Upon termination or expiration of this Agreement (without renewal or extension), we shall have the right and are hereby empowered to effectuate the Telephone Numbers Assignment and, in such event, you shall have no further right, title or interest in the telephone numbers and listings and shall remain liable to the telephone company for all charges and fees owing to the telephone company on or before the effective date of the assignment hereunder.

You agree and acknowledge that as between us and you, upon termination or expiration of the Franchise Agreement, we shall have the sole right to and interest in the telephone numbers and listings, and you appoint us as your true and lawful attorney-in-fact to direct the telephone company to assign same to us, and execute such documents and take such actions as may be necessary to effectuate the assignment. Upon such event, you shall immediately notify the telephone company to assign the telephone numbers and listings to us. If you fail to promptly direct the telephone company to assign the telephone numbers and listings to us, we shall direct the telephone company to effectuate the Telephone Number Assignment. The parties agree that the telephone company may accept our written direction, the Franchise Agreement or the Telephone Number Assignment as conclusive proof of our exclusive rights in and to the telephone numbers and listings upon such termination or expiration and that such assignment shall be made automatically and effective immediately upon telephone company's receipt of such notice from us or you. The parties further agree that if the telephone company requires that the parties execute the telephone company's assignment forms or other documentation at the time of termination or expiration of the Franchise Agreement, our execution of such forms or documentation on your behalf shall effectuate your consent and agreement to the assignment. The parties agree that at any time after the date hereof, they will perform such acts and execute and deliver such documents as may be necessary to assist in or accomplish the assignment described herein and the Telephone Number Assignment upon termination or expiration of the Franchise Agreement.

## 10. Construction, Design and Appearance; Equipment.

(a) **Construction.** You agree that you will construct or remodel the Premises at the Location in accordance with our construction or remodeling plans and design, layout and decor specifications. You shall purchase or lease the pizza preparation, beverage storage or dispensing, storage and other equipment, displays, fixtures, and furnishings that we designate. You shall make no changes to any building plan, design, layout or decor, or any equipment or signage without our prior written consent, and shall maintain the interior and exterior decor in such manner as may be reasonably prescribed from time to time by us.

(b) **Signs.** You shall prominently display, at your expense, both on the interior and exterior of the Premises, advertising signs in such form, color, number, location and size, and containing such Marks, logos and designs as we shall designate. Such signs shall be obtained from a source designated or approved by us. You shall obtain all permits and licenses required for such signs and shall also be responsible for ensuring that all signs comply with all laws and ordinances. You shall not display in or upon the Premises any sign or advertising of any kind to which we object.

    **(c)**   **Papa John's PROFIT System™; Purchase and Installation.** You agree to: (1) acquire the "Information System" (as defined below) for the Restaurant and the right to use, for the term of this Agreement, the "Designated Software" (as defined below) in the manner specified by us; (2) obtain any and all peripheral equipment and accessories, arrange for any and all support services and take all other actions that may be necessary to enable the "Information System" (as defined below) and the Designated Software to operate as specified by us (including but not limited to installation of electrical wiring and data cabling, and temperature and humidity controls) that may be necessary to prepare the Restaurant to enable the "Papa John's PROFIT System™" (as defined below) to operate as specified by us; and (2) install and commence using the Designated Software on the Information System, and use such items solely in the operation of the Restaurant in the manner specified by us. You shall be responsible for all costs associated with the foregoing, including but not limited to transportation, installation, sales, use, excise and similar taxes, and site preparation. You agree to operate only Designated Software on the Papa John's PROFIT System™. You acknowledge and agree that the Designated Software, and all additions, modifications and enhancements thereto, shall be deemed to be "confidential information" and shall be subject to Section 17 of this Agreement.

    **(i)**   **Definitions.** For purposes of this Agreement, the terms listed below shall have the meanings that follow them.

    **"Designated Software"** - Such software, programming and services as we may specify or require from time to time for use by you in the Restaurant. The Designated Software does not include any data or data bases owned or compiled by us for use with the Papa John's PROFIT System™ or otherwise or any data generated by the use of the Designated Software. The Designated Software may consist of either or both of the following:

        **(A)**   **Packaged Software.** The Designated Software may consist of software purchased and licensed from us or a third party and/or may contain third-party subcomponents that we have the authority to license or sell to you ("Packaged Software") pursuant to and in accordance with agreements that we enter into with such third-party vendors (collectively, the "Packaged Software Agreements").

        **(B)**   **Proprietary Programs.** The Designated Software may consist of or contain proprietary computer software programs that we may develop or cause to be developed and that are owned by us and that we designate for use on the Papa John's PROFIT System™ in the operation of a Restaurant, including any modifications, additions or enhancements to such software programs ("Proprietary Programs").

    **"Information System"** - Those brands, types, makes, and/or models of communications and computer systems or hardware specified and required by us for use in the Restaurant or between or among Papa John's Restaurants and/or us. The Information System will include point of sale systems, information storage, retrieval, transmission systems and security systems.

-17-

**"Papa John's PROFIT System™"** - The Designated Software and Information System collectively.

(ii)     **Grant of License.**  We agree to grant to you, and to cause our Vendors (defined below) to grant to you, a nonexclusive, nontransferable, nonassignable license to use the Designated Software, subject to the same terms and conditions as the Designated Software is licensed to our other franchisees in general.  You agree to be bound by the terms of each Packaged Software Agreement and, to the extent you purchase all or portions of the Designated Software from or through us, agree that the vendors and licensors of all or portions of the Designated Software (collectively, the "Vendors") are third-party beneficiaries of this Agreement with full rights to enforce this Agreement as it pertains to the Designated Software. You acknowledge and agree that the Designated Software and any data generated by the use of the Designated Software are the valuable, proprietary property and trade secret of us and/or our Vendors, and you agree to use the utmost care to safeguard the Designated Software and any data generated by the use of the Designated Software and to maintain the copyright protection and the secrecy and confidentiality thereof.

### (iii)     Access; Enhancements and Changes.

(A)     **Access to System.**  We shall have the right at all times to access the Papa John's PROFIT System™ and to retrieve, analyze, download and use the Designated Software, and all software, data and files stored or used on the Papa John's PROFIT System™. We may access the Papa John's PROFIT System™ in the Restaurant or from other locations, including our headquarters and regional offices. You shall store all data and information on the Papa John's PROFIT System™ that we designate from time to time.  No unauthorized data or information may be stored on the Papa John's PROFIT System™.

(B)     **Enhancements and Changes.**  During the term of this Agreement, and provided that you are in compliance with the terms of this Agreement, we shall provide to you, and you shall promptly implement, all upgrades, modifications, enhancements, extensions, error corrections and other changes to the Papa John's PROFIT System™ developed or adopted by us for use in the operation of the Restaurant.

(C)     **Information Systems Maintenance.**  You agree to maintain the Information System in accordance with our published maintenance program, as amended from time to time (which will also be adhered to by our Papa John's restaurants).  You also agree that if you fail to maintain the Information System in accordance with our published maintenance program, you shall reimburse any costs that we or our agents incur to bring your Information System up to our standards.  The published maintenance program may include, but is not limited to, a hardware spares program and a preventative maintenance program.  You acknowledge that such maintenance is necessary to help ensure the proper functioning of the Papa John's PROFIT System™.

-18-

**(D)     Ideas and Suggestions.**  You shall promptly disclose to us all ideas and suggestions for modifications or enhancements of the Papa John's PROFIT System™ or any component thereof that are conceived or developed by or for you, and we and our Affiliates shall have the right to use and license such ideas and suggestions. All modifications and enhancements made to the Papa John's PROFIT System™ together with the copyright therein shall be the property of us (or the appropriate Vendor if we so designate), without regard to the source of the modification or enhancement, and you hereby assign all of your right, title, and interest in any ideas, modifications, and enhancements to us (or the appropriate Vendor if we so designate).  You agree to execute any documents, in the form provided by us, that we determine are necessary to reflect such ownership.

**(E)     Removal.**   Upon expiration or termination of this Agreement, you shall allow our employees or agents to remove the Designated Software from the Information System, and you shall immediately return to us the Designated Software, each component thereof, any data generated by the use thereof, all documenta-tion for the Designated Software and other materials or information that relate to or reveal the Designated Software and its operation.  You shall immediately destroy any and all back-up or other copies of the Designated Software or parts thereof, and any data generated by the use of the Designated Software (other than financial information relating solely to you).

**(iv)     On-Site Installation Fee.**  You agree to pay to us upon installation of the Designated Software on your Information System, an on-site installation fee (the "On-Site Installation Fee") in the amount of $1,000 for a two-day install and $2,000 for a four-day install, plus all reasonable travel, lodging and other expenses that we incur in connection with the installation.  In exchange for this On-Site Installation Fee, we will install the Designated Software on the Information System and provide one or more of our system installers/trainers at the Restaurant, generally, for a four-day install, 2 days before the Restaurant opens for installation and training and 2 days after the Restaurant is open, for support.   This in-staller/trainer will assist your employees in the use of the Papa John's PROFIT System™.  We may also charge additional On-Site Installation Fees, not to exceed $750 plus expenses, each time an enhancement or modification to the Papa John's PROFIT System™ is installed at the Location.  The On-Site Installation Fee does not include any hardware, supplies, data cabling, electrical wiring, or cash drawer or shelving installation or other site work necessary to prepare the Restaurant for the Papa John's PROFIT System™.  These are your sole responsibility. However, some or all of these materials and services may be offered by us or our agent for an additional fee.  If more than 4 days of on-site installation, training and support is required, it will be provided by us or our agent for $500 per day plus additional expenses.

**(v)     On-Site Support Fee.**  You agree to pay us $250 per day each time on-site support is required for enhancements, modifications or maintenance to the Papa John's PROFIT System™ (the "On-Site Support Fee").  Generally, enhancements and upgrades are accomplished electronically through modem access, in which case no on-site support or fee payment is required.

**(vi)   Help Desk Service Fee.**   You agree  to pay to us a recurring software support service fee ("Help Desk Service Fee") in the amount of:  (A) $70 per month if you subscribe to the Help Desk; or (B) $80 per hour, with a ½ hour minimum, if you elect to pay for Help Desk services on a fee-for-service basis.  In exchange for this fee, we will provide general assistance and support for your Papa John's PROFIT System™.

**(vii)   Software Enhancement Fee.**   You agree to pay to us a software enhancement fee, which shall be $41 per month ("Software Enhancement Fee").  This fee will be invoiced quarterly (i.e. $123 per quarter).  This Software Enhancement Fee includes software maintenance, research and development, upgrades and enhancements and installation media, if any, that we adopt, require or provide.  Installation on the Papa John's PROFIT System™, if required, will be charged as described in Section 10.(c)(iv).

**(viii)   Increases in Fees.**   The On-Site Installation Fee, the On-Site Support Fee, Help Desk Fee, the Software Enhancement Fee and/or per diem charges may be increased by us from time to time.

**(ix)   Warranties and Limitation of Liability.**   We represent and warrant to you that if we sell or license the Proprietary Programs to you:  (A) we will have all rights, licenses and authorizations necessary to license the Proprietary Programs to you, subject only to nonexclusive licenses granted to others; and (B) the Proprietary Programs will not, and as a result of any enhancements, improvements or modifications provided by us will not, to the best of our knowledge, infringe upon any United States patent, copyright or other proprietary right of any third party.  In the event your use of the Proprietary Programs as provided by us is enjoined as a result of a claim by a third party of patent or copyright infringement or violation of proprietary rights, we shall, in our sole discretion, either:  (1) procure for you the right to continue use of the Proprietary Programs as contemplated hereunder; or (2) replace the Proprietary Programs or modify it such that there is no infringement of the third party's rights; and such action by us shall be your sole and exclusive remedy against us in such event.  We do not represent or warrant to you, and expressly disclaim any warranty that the Proprietary Programs are error-free or that the operation and use of the Proprietary Programs by you will be uninterrupted or error-free.  We shall have no obligation or liability for any expense or loss incurred by you arising from use of the Proprietary Programs in conjunction with any other computer program. Without limiting the generality of the foregoing, you are solely responsible for inputting into and configuring the PROFIT System to accommodate information of local applicability, including, without limitation, state and local taxability of goods and services sold or provided in the Restaurants and state and local sales tax rates.

**EXCEPT FOR THE ABOVE EXPRESS LIMITED WARRANTIES, WE MAKE NO WARRANTIES, EXPRESS OR IMPLIED, ORAL OR WRITTEN, WITH RESPECT TO THE DESIGNATED SOFTWARE OR ANY PORTION THEREOF, INCLUDING ANY PROGRAM DOCUMENTATION OR OTHER MATERIAL FURNISHED HEREUNDER, OR ANY COMPONENT THEREOF, AND THERE ARE EXPRESSLY EXCLUDED ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT THERETO.   WE SHALL HAVE NO LIABILITY FOR CONSEQUENTIAL, EXEMPLARY, INCIDENTAL OR PUNITIVE DAMAGES.**

**(d)    Maintenance, Remodeling, Re-equipping, Enhancements and Replacements.**    You agree at all times to maintain the Restaurant in accordance with our standards, and that you will, within 90 days from the date of written notice from us, remodel or re-equip or perform such maintenance at the Restaurant in accordance with the specifications we provide.  Such maintenance, remodeling and re-equipping may include, without limitation: replacing worn out, obsolete, or dated equipment, fixtures, furnishings and signs; structural modifications; painting and redecorating; and purchasing more efficient or improved equipment. We may require you to perform maintenance and remodeling and to purchase equipment at such times as we deem necessary and reasonable; provided, that we may not require any significant remodeling of the Restaurant during the first 2 years of the Initial Term.  We may, during the term of this Agreement, require you to modify, enhance and/or replace all or any part of the Information System and/or the Designated Software at your expense, and you agree, within 120 days of receipt of written notice from us, to acquire, or acquire the right to use for the remainder of the term of this Agreement, the modified, enhanced or replacement version of the Information System and/or Designated Software specified by us.  You agree to take all other actions as may be necessary to enable the modified, enhanced or replacement Information System and Designated Software to operate as specified by us.  Any such modifications, enhancements, and replacements may require you to incur costs to purchase, lease and/or license new or modified computer hardware and/or software or other equipment and to obtain different and/or additional service and support services during the term of this Agreement.  You acknowledge that we cannot estimate the costs of future maintenance, enhancements, modifications, and replacements to the Restaurant, equipment, signage, Papa John's PROFIT System™ or other items.  YOU ACKNOWLEDGE THAT EQUIPMENT, ADDITIONS, ENHANCEMENTS, ALTERATIONS, MAINTENANCE AND RENOVATIONS REQUIRED BY US MAY INVOLVE SUBSTANTIAL ADDITIONAL INVESTMENT BY YOU DURING THE TERM OF THIS AGREEMENT.

**11.    Operations; Standards of Quality; Inspections.**

**(a)    Principal Operator.**    You shall designate an individual to serve as the "Principal Operator" of the Restaurant.  The Principal Operator shall meet the following qualifications:

(i)    The Principal Operator shall own at least a 5% equity interest in you; provided that you shall not be in default of this requirement if the Principal Operator is entitled to a bonus of not less than 5% of the net profits of the Restaurant, payable after the end of each Period, and also has the right to acquire not less than a 5% equity interest in you within 12 months of his or her hire date, which rights shall be evidenced by a written agreement between the Principal Operator and you.  You shall provide us with a copy of any such agreement upon request.  Once the Principal Operator has acquired an equity interest in you, he or she must continue to own that interest (or a greater interest) during the entire period he or she serves as the Principal Operator.

(ii)    The Principal Operator shall devote full time and best efforts to the supervision and conduct of the development and operation of the Restaurant and, as required in this Agreement, shall agree to be bound by the confidentiality and non-competition

-21-

provisions of the Owner Agreement.  At such time as the Principal Operator becomes an owner of an interest in you, he or she must agree to be bound by all the provisions of the Owner Agreement.

(iii)     The Principal Operator shall be a person approved by us who shall complete our initial training requirements and who shall participate in and successfully complete all additional training as we may reasonably designate.

(iv)     The Principal Operator must be proficient in writing and speaking English, to ensure compliance with our operational standards and to ensure efficient communications with customers and us.

If, at any time for any reason, the Principal Operator no longer qualifies to act as such, you shall promptly designate another Principal Operator subject to the same qualifications listed above.  Any sale or transfer of any portion of the Principal Operator's interest in you, if any, that would reduce the Principal Operator's equity interest or voting rights in you to less than 5% of the total shall be deemed a transfer of an interest and shall be subject to the terms and conditions of Section 14 hereof; and any failure to comply with such terms and conditions shall be deemed a default by you under this Agreement.  However, if the Principal Operator owns 5% or less of you, then a transfer of the Principal Operator's interest to you, another shareholder, member or partner of you or to a successor Principal Operator shall not require our consent, shall not be subject to our right of first refusal and no transfer fee shall be required.  You shall promptly notify us in writing of any such transfer and provide all information about the transferee and the terms of the transfer as we may reasonable request.

**(b)     Management of the Restaurant.**  The Principal Operator shall personally devote his/her full time and best efforts to the management and operation of the Restaurant in order to ensure compliance with this Agreement and to maintain our high standards.  Management responsibility shall include, without limitation:  presence of the Principal Operator or a manager at the Restaurant during all business hours; maintaining the highest standards of product quality and consistency; maintaining the Restaurant in the highest condition of sanitation, cleanliness and appearance; and supervising employees to ensure that the highest standard of service is maintained and to ensure that your employees deal with customers, suppliers, us, and all other persons in a courteous and polite manner.

**(c)     Compliance with Our Standards.**  You shall have full responsibility for the conduct and terms of employment for your employees and the day-to-day operation of your business, including, without limitation, hiring, termination, pay practices and any other employment practices.  However, you shall operate the Restaurant through strict adherence to the standards, specifications and policies of the System as they now exist, and as they may from time to time be modified, in order to ensure compliance with the quality standards of the System.  Such standards and policies include, without limitation:  (i) specifications and preparation methods for food and beverages; (ii) hours of operation; (iii) menu items and services offered; (iv) employee uniform requirements and specifications; and (v) use of specified emblems and Marks on containers, bags, boxes, napkins, and other products.

       **(d)**    **Training.**  Should any employee or prospective employee of yours perform work that in our reasonable judgment requires additional operational training, skills or knowledge, such employee shall take part in such additional training and instruction.  You shall be solely responsible for all wages, travel and living expenses, and all other costs incurred by you and your employees in connection with any training or instruction that we provide.  You shall also, at your own expense, conduct at the Restaurant such training and instruction, using such materials, equipment and supplies, as we may reasonably require from time to time.

       **(e)**    **Manuals.**  We will lend to you one or more manuals that contain:  (i) the mandatory and suggested specifications, standards and operating procedures prescribed from time to time by us; and (ii) information relative to other obligations hereunder and the operation of the Restaurant (the "Manuals").  The Manuals shall at all times remain our sole property.  We may, from time to time, revise the contents of the Manuals.  To the extent that we deem it necessary or appropriate, we will provide you with policy and procedure statements or other written notice of specifications, standards and procedures.  You agree to promptly adopt and use the formulas, methods, procedures, policies, menus, recipes, food products and other standards and specifications contained in the Manuals, policy and procedure statements and other written notices as issued and/or as modified from time to time by us.  You acknowledge and agree that all information in the Manuals, policy and procedure statements and other notices constitute confidential information and trade secrets, and shall not be disclosed at any time by you.  You shall not copy any part of the Manuals or any other communication or information provided by us.

       **(f)**    **Variations in Standards.**  You shall not implement any change to the System without our prior written consent.  However, because complete and detailed uniformity under varying conditions may not be possible or practical, we specifically reserve the right, in our sole discretion and as we may deem in the best interests of you or the Chain, to vary the System, including specific standards, policies and/or procedures, within the Restaurant or any other restaurant(s) in the Chain based upon peculiarities of a particular location or circumstances, including, but not limited to:  density of population and other demographic factors; size of the Territory; business practices or customs; and any other condition that we deem to be of importance to the operation of such restaurant(s) or the Chain.  You acknowledge that because of these factors and others, there may be variations from standard specifications and practices in the Chain and that you shall not be entitled to require us to grant like or similar variations or privileges to you.

       **(g)**    **Your Developments.**  We shall have the right to use and incorporate into the System for the benefit of other franchisees and us any modifications, ideas or improvements, in whole or in part, developed or discovered by you or your employees or agents, without any liability or obligation to you or the developer thereof.

       **(h)**    **Compliance with Laws.**  You shall at all times during the Term comply with all applicable laws, ordinances, rules and regulations of all governmental bodies.

       **(i)**    **Courtesy; Cooperation.**  At all times and under all circumstances, you and your employees shall treat all customers and other persons, including our agents, officers, and

employees, with the utmost respect and courtesy and shall fully cooperate with us and our agents, officers and employees in all aspects of the franchise relationship.

        **(j)**    **Inspections.** An agent, officer or employee of ours may make inspections of the Restaurant to ensure compliance with all required standards, specifications and procedures. Our representative shall be allowed to inspect the condition and operation of the Restaurant and all areas of the Restaurant at any time during normal business hours. Such inspections may include, without limitation: (i) reviewing sales and order forms; (ii) observing the Principal Operator and all managers and your other employees; (iii) interviewing any such persons; (iv) interviewing customers of the Restaurant in order to evaluate your performance and to ensure that the Restaurant is being operated in accordance with the requirements of this Agreement and the Manuals; and (v) conducting any type of audit or review necessary to evaluate your compliance with all required standards, specifications or procedures. We may, from time to time, make suggestions and give mandatory instructions with respect to your operation of the Restaurant, as we consider necessary or appropriate to ensure compliance with the then-current quality standards of the System and to protect the goodwill and image of the System.

        **12.**    **Products; Commissary; Menu.**

        **(a)**    **Products.** You agree that you will use only those food items, ingredients, beverages, cooking materials, containers, boxes, cups, packaging, menus, uniforms, and other products and materials in the operation of the Restaurant as we specifically designate or approve. You may be required to purchase from us certain products that involve trade secrets or that have been specially prepared by us or at our direction or that we consider to be integral to the System. We may require that certain products be purchased from one or more designated suppliers. Products other than those required to be obtained from us or a designated supplier may be purchased from any source, provided that the particular supplier and products have been approved by us. We may, from time to time, amend the list of approved products and suppliers. You acknowledge and agree that we, our Affiliates or the Marketing Fund may, from time to time, derive revenue from designated or approved suppliers based on the sale of products to you and our other franchisees.

        **(b)**    **Quality Control Centers.** PJ Food Service, Inc. ("PJFS") and PJFS of Mississippi, Inc. ("PJFS of Mississippi") presently supply designated and approved products to Papa John's restaurants owned by us or our Affiliates and those of our franchisees from quality control centers that are either owned or operated by PJFS, PJFS of Mississippi or us (the "QCCs"). PJFS and PJFS of Mississippi are currently the only designated suppliers of dough for use by Papa John's restaurants and you must purchase dough from PJFS, PJFS of Mississippi or a designated representative unless and until such time as a successor supplier of dough is designated. Neither PJFS nor PJFS of Mississippi has any obligation to continue supplying you or to continue to operate a QCC. If either of them ceases operating the QCCs or terminates service to you (other than as a result of the termination or expiration of the Franchise), we shall provide you with the name, address and phone number of an alternative approved supplier(s) and the products to be purchased from such supplier(s). All purchases by you from the QCCs are on the terms specified from time to time by PJFS or PJFS of

Mississippi, including, without limitation, your provision of unattended access to the Restaurant for the purpose of effecting unattended deliveries during times when the Restaurant is closed. PJFS and PJFS of Mississippi, through us, hereby reserve the right to specify different terms for different franchisees.  We make no representations or warranties about any of the services performed by or any of the products produced or sold by or through PJFS or PJFS of Mississippi.

       **(c)**    <u>**Menu Items.**</u>  You shall:  (i) offer for retail sale, and shall carry on your menu, only those types, sizes, styles and brands of pizza, pizza dough, pizza sauce, toppings, beverages, and other products as we specify from time to time; and (ii) make all menu items specified by us available for carry-out and delivery service from the Restaurant.  You agree that you will not sell or carry on your menu any food items or other products, or provide any services, that we have not specified or approved.

       **(d)**    <u>**Pricing.**</u>  You shall have the sole responsibility for establishing your prices (provided that we may set maximum retail prices), but you shall charge the same price for each product whether sold in the Restaurant or delivered unless we otherwise approve, and specifically, you shall not make or collect any delivery charge or other separate charge for delivered products, regardless of how named or characterized, without our approval.  If we have established a maximum retail price for a particular product or service, you may charge any price for such product or service, not to exceed the maximum retail price that we have established.

       13.    <u>**Accounting and Reports.**</u>

       **(a)**    <u>**Accounting.**</u>  We may lend to you and/or the person(s) who will be preparing your reports and financial statements for each Period or year end one or more manuals, which manual(s) may contain mandatory and/or optional accounting procedures, forms, chart of accounts and other items deemed relevant or necessary by us.  You agree to direct your bookkeeper/accountant to follow all mandatory policies, procedures, forms, formats and other items set forth in such manuals.  The accounting manual(s) shall be part of the "Manuals" as defined in this Agreement.

       **(b)**    <u>**Recordkeeping.**</u>  You shall establish and maintain accounting and record keeping systems substantially in accordance with the specifications and procedures provided by us and as amended from time to time, including without limitation, maintaining accounting records on a basis enabling or facilitating reporting to us according to monthly or multi-week periods (each such accounting period is referred to as "Period").  You shall make all such records available to us upon request.  You shall maintain and preserve, for at least five years from the date of preparation, full, complete and accurate books, records and accounts.

       **(c)**    <u>**Periodic Reports.**</u>  Upon our request, you shall deliver to us:  (i) a statement, in the form prescribed by us, of the revenues and expenses of the Restaurant for the immediately preceding Period; and (ii) such other records and reports as are requested by us, including but not limited to, bank statements, sales and expense forms and reports, and a current balance sheet.

(d)     **Review by Us.**  At all times during the Term, we, or our authorized agent, shall have the right to review all your sales and expense records and reports that are located in or which relate to the Restaurant, and to make photocopies of all such items.

(e)     **Year-End Reports.**  Within 120 days following your fiscal year end, you shall provide us with copies of your financial statements, including an income statement for the fiscal year just ended and a balance sheet as of the end of such fiscal year, which financial statements shall be prepared in accordance with generally accepted accounting principles applied on a consistent basis.  You shall furnish us with copies of all state sales tax returns as we request from time to time.  You shall promptly notify us if any such return is not timely filed, or if any extension is filed, and the reasons therefor.

(f)     **Examinations and Audits.**  We or our designated agents shall have the right, at all times and upon reasonable notice, to examine or audit your books and records, and to make photocopies thereof.  If any such examination or audit discloses any underpayment of the Royalty, Marketing Fund payments, or any other sums or fees owed to us, you shall immediately pay the deficient amount plus interest thereon from the date due until paid, at a rate equal to 12% per annum.  All payments received will first be credited against interest due and then against other payments due.  If such an examination or audit discloses an understatement in any statement or report of 5% or more, you shall, in addition to the above provision, reimburse us for the cost of having your books examined or audited.  The foregoing shall be in addition to any other rights or remedies we may have, including the termination of the Franchise granted herein.

14.     **Transfers; Our Right of First Refusal.**

(a)     **Transfers by Us.**  We may transfer or assign this Agreement or any or all of the rights, interests, benefits or obligations arising hereunder without restriction.  Upon any transfer or assignment of this Agreement by us, we shall be released from all obligations and liabilities arising or accruing in connection with this Agreement after the date of such transfer or assignment.

(b)     **Transfers by You.**  Your rights and interests under this Agreement are and shall remain personal to you.  You recognize that we have granted the Franchise in reliance on your business and financial capacity and other attributes, and in reliance upon the Owner Agreement.  Accordingly, neither you nor any holder of any capital stock or other ownership interest in you (if you are a corporation or other entity) shall, without obtaining our prior written consent, transfer:  (i) any interest in this Agreement; (ii) any material portion of your assets or the assets of the Restaurant; or (iii) any stock or other ownership interest in you; provided, that a member, partner or shareholder of you may transfer all or a portion of such interest in you to another member, partner or shareholder or to you (such person or entity being referred to as a "Permitted Transferee") and such a transfer shall not be subject to our consent or right of first refusal and no transfer fee shall be required.  You shall promptly notify us of any such transfer. For purposes of this Agreement, the term "transfer" shall mean any issuance, sale, assignment, gift, pledge, mortgage or any other encumbrance (other than a lien against your assets to secure a loan for purchase of the Premises or the construction, remodeling, equipping or operation of

the Restaurant), transfer by bankruptcy, transfer by judicial order, merger, consolidation, share exchange, transfer by operation of law or otherwise, whether direct or indirect, voluntary or involuntary. Our consent to a particular transfer shall not be deemed as consent to any subsequent or different transfer. If you grant a security interest in your assets to secure a loan for purchase of the Premises or construction, leasehold or equipment costs, you shall ensure that the secured party agrees in writing that: (A) upon default by you, it shall notify us and we shall have the right, but not the obligation, to be substituted as the debtor and to cure the default; and (B) any acceleration of indebtedness provisions of the loan documents shall not be exercisable if we cure the default and assume the indebtedness. Upon the occurrence of a default and our election to assume the indebtedness, the Franchise and this Agreement shall automatically terminate and we shall have the right under Section 20 to purchase the assets used in the Restaurant. The purchase price as determined under Section 20 shall be reduced by the amount of the debt that we assumed.

        **(i)**    **Our Right of First Refusal.** You shall give us at least 45 days prior written notice of any intended transfer of any of your rights or interest under this Agreement or of the proposed transfer of any interest in you or any material portion of your assets. Such notice shall set forth the name of the proposed transferee and a detailed statement of all of the terms and conditions of such intended or proposed transfer. Subject to subsection (c) below, we will not unreasonably withhold our consent to a proposed transfer. Irrespective of the qualifications or acceptability of any prospective transferee, we shall have the first right and option to purchase the interest intended or proposed to be transferred at the same price and on the same terms and conditions contained in the notice. Should the proposed transfer involve the payment of any non-cash consideration, we shall have the option to purchase the interest at a price equal to the fair market value of such non-cash consideration plus the amount, if any, of consideration to be paid in cash. We shall determine the fair market value of the non-cash consideration using fair and reasonable methods. We shall make such determination as promptly as practicable, but in no event later than 30 days after we have received the notice of the intended transfer. If you disagree with the value as we determine, then you and Papa John's shall each hire an appraiser (or a single appraiser, if you and Papa John's so agree) to value the non-cash consideration. If the appraisals are within 20% of each other, then the difference between the two shall be equally divided to establish the price at which we may exercise our first right and option. If the difference between the appraisals is greater than 20%, then the issue of the fair market value of such consideration shall be determined by a third appraiser selected by the other two appraisers and whose decision shall be final, except that it may not be lower or higher than the lowest appraisal and highest appraisal, respectively, determined by the first two appraisers. Should a proposed transfer not involve the payment of any consideration, we have the option to purchase the interest at a price equal to 1½ times the Net Profits of the Restaurant over the previous 12-month period (or the average monthly Net Profit of the Restaurant multiplied by 12, if it has been operating less than 12 months) multiplied by the percentage that the interest to be transferred bears to all interests in, or assets of, the Restaurant or you, as the case may be. As used in this Agreement, Net Profits means the amount of profit, if any, determined from statements of profit and loss prepared by an independent public accountant that we find acceptable. Within 30 days after we receive notice of a proposed transfer for no consideration or solely for cash, or if the proposed transfer will not be solely for cash, within 10 days after a determination is made of the fair market value of

the non-cash consideration, we will notify you that we are exercising our right of first refusal or approving the transfer or denying approval of the transfer.  Our decision to deny approval shall be final.

       **(ii)**      **Approved Transfers.**  If we decide not to exercise our right of first refusal, and if we approve the transfer in writing, you (or the transferor of an interest in you) may make the proposed transfer on the exact terms and conditions specified in your notice to us, within 60 days after the expiration of our option.  If the transfer is not consummated within such 60-day period, you may not thereafter transfer such interest without again complying with this Section.

       **(c)**      **Conditions on Transfer.**  We agree that we will not unreasonably withhold our consent to a proposed transfer if all of the following conditions are satisfied:

       (i)      we have decided not to exercise our right of first refusal as provided above;

       (ii)      you are in full compliance with this Agreement and there are no uncured defaults by you hereunder, and all your debts and financial obligations to us and our Affiliates under this Agreement or otherwise are current and your obligations to the Marketing Fund and each Cooperative of which you are a member are current;

       (iii)      the proposed transferee executes such documents as we may reasonably require to evidence that such transferee has assumed your obligations under this Agreement, and if required by us, the proposed transferee executes, and in appropriate circumstances, causes such other parties as we may require to execute, our then-current form of Owner Agreement, and other then-current ancillary agreements, which documents may be substantially different than those attached to this Agreement;

       (iv)      the proposed transferee enters into an Advertising Agreement with the Marketing Fund and also becomes a member of the Cooperative to which the Restaurant is required to contribute;

       (v)      prior to the date of the proposed transfer, the proposed transferee's Principal Operator and managers undertake and successfully complete such training and instruction as we deem necessary;

       (vi)      we are satisfied that the proposed transferee (and if the proposed transferee is an entity, all owners of any interest in such entity) meets all of the requirements for our new franchisees applicable on the date we receive notice of the proposed transfer, including, but not limited to, good reputation and character, business experience, restaurant management experience, and financial strength and liquidity;

       (vii)      you and any owner transferring an interest in you acknowledge and agree in writing that you and they are bound by the non-competition and confidentiality provisions set forth herein and in the Owner Agreement (and any similar provision in any other

document that either you or they have executed) to the maximum extent allowed under applicable law;

(viii)   you and all owners of an interest in you execute a general release, in the form prescribed by us, releasing, to the fullest extent permitted under the laws of the state where either the Restaurant to be transferred or you, as applicable, is/are located, all claims that you or any of them may have against us or our Affiliates or subsidiaries, including our and their respective shareholders, officers, directors and employees, in both their individual and corporate capacities, and if you are the transferor, you shall acknowledge in writing that your interest under this Agreement is terminated;

(ix)   you pay to us a transfer fee of $7,500, provided that, if the proposed transfer is of the Restaurant together with one or more other Papa John's restaurants owned by you to a single transferee, then the total transfer fee shall be an amount equal to the greater of $7,500 or our actual costs and expenses incurred in approving and effecting the transfer, including, without limitation, all "in-house" and outside personnel and professional costs;

(x)   you perform, or the proposed transferee agrees in writing to perform, such maintenance, remodeling and re-equipping of the Restaurant as we may specify in writing, which may include, without limitation:  replacing worn out, obsolete, or dated equipment, fixtures, furnishings and signs; structural modifications; painting and redecorating; and purchasing more efficient or improved equipment; and

(xi)   the proposed transferee and all owners of any interest in a transferee that is an entity provide to us, at least 45 days prior to the proposed transfer date, copies of financial statements for the preceding three years, and where applicable, its certificate of incorporation and bylaws, articles of organization and operating agreement (if an LLC) or agreement and certificate of partnership (and any amendments or modifications thereof), minutes and resolutions and all other documents, records and information pertaining to the transferee's existence and ownership.

(d)   **Ownership and Structural Changes.**   Except for transfers between Permitted Transferees, any ownership or structural changes in you, including but not limited to, any merger, reorganization, issuance of additional shares or classes of stock or additional membership or partnership interests, shall constitute and be deemed a transfer of the Franchise and shall be subject to our prior written approval.

15.   **Death, Incapacity or Dissolution.**

(a)   **Transfer Upon Death, Etc.**   Upon your death or permanent incapacity; or, if you are a corporation, limited liability company, partnership or other entity, upon the death, incapacity or dissolution of any owner of any interest in you; the executor, administrator, conservator, trustee or other representative of such person or entity shall assign such interest in the Franchise, or such interest in you, to us or a third party approved by us; provided, that if the transferee is a Permitted Transferee, our right of first refusal shall not apply and no transfer

fee shall be payable.  Further, if an approved transfer involves less than 25% of the ownership of you, no transfer fee shall be payable.  If you are one or more individuals and any of you dies or becomes permanently incapacitated, and if the law of the jurisdiction where the Restaurant is located so provides, nothing contained in this Section shall deny your spouse, heirs or personal representative the opportunity to participate in the ownership of the Franchise for a reasonable time after your death or incapacity, provided that:  (i) this Agreement is valid and in effect; (ii) the spouse, heirs or representative meets all conditions and qualifications otherwise required of transferees; and (iii) such spouse, heirs or representative maintains and complies with all standards and obligations contained in this Agreement.  An assignment under this Section 15 shall be completed within a reasonable time, not to exceed 9 months from the date of death, permanent incapacity or dissolution and shall (except as otherwise provided above) be subject to the terms and conditions applicable to lifetime transfers contained in Section 14, including our right of first refusal.

      **(b)**    <u>Management by Us</u>.  Pending assignment, if the Principal Operator ceases managing the Restaurant and another shareholder, member, partner or employee of you that qualifies as the Principal Operator does not assume such obligations, we may, at our sole option, appoint a manager to operate the Restaurant for your account.  All expenses of the Restaurant, including compensation, travel and living expenses, and other costs of the appointed manager, and a reasonable per diem fee for our administrative expenses, shall be charged to you.  Operation of the Restaurant during any such period shall be for and on your behalf.  The appointed manager shall have a duty only to utilize his or her best efforts in the management of the Restaurant and neither we nor the appointed manager shall be liable to you or your owners for any debts, losses, liabilities or obligations incurred by the Restaurant, or to any of your creditors for any merchandise, materials, supplies or services purchased by the Restaurant during any period in which it is managed by our appointed manager.

      **16.**    <u>**Your Additional Covenants.**</u>

      **(a)**    <u>**Limitations on Activities.**</u>  If you are a corporation, limited liability company, partnership or other entity, you shall not at any time during the Term of this Agreement, own, operate or have any interest in any other business or business activity other than the operation of Papa John's restaurants pursuant to agreements with us.  If you are an individual and are also the Principal Operator, you have disclosed to us all businesses in which you have an interest, or are engaged in, and covenant that you will notify us of any intention to participate or engage, directly or indirectly, in any other business activity at least 30 days before undertaking such activity or becoming a party to any agreement or understanding relating to such activity.  You shall provide us with such information in regard thereto as we may reasonably request and will not engage or participate in any such activity unless you receive our written consent.

      **(b)**    <u>**Execution of Ancillary Documents.**</u>  Simultaneously with the execution of this Agreement, you shall cause each person or entity owning any beneficial interest in you to execute an Owner Agreement in the form provided by us.

      **(c)**    **Your Non-Compete.**  You covenant and agree that during the Term of this Agreement (including the Renewal Term, if applicable) and for a period of two years after the termination or expiration of the Franchise (the "Restricted Period"), regardless of the reason for such termination or expiration, you shall not, within a 10-mile radius of (A) the Restaurant, or (B)  any business location at which we or an Affiliate or our franchisee then operates a Papa John's restaurant or other Papa John's business, engage in any of the following activities:

           (i)    directly or indirectly enter into the employ of, render any service to or act in concert with any person, partnership, limited liability company, corporation or other entity that owns, operates, manages, franchises or licenses any business that (A) sells pizza or other non-pizza products (excluding soft drinks) that are the same as those sold by Papa John's restaurants on a delivery or carry-out basis, including, without limitation, business formats such as Domino's, Pizza Hut, Mr. Gatti's, Sbarro, Little Caesars and Pizza Magia, or (B) derives 20% or more of its gross revenues, at the retail level, from the sale of pre-cooked, ready-to-eat food products on a delivery basis (a "Competitive Business"); or

           (ii)    directly or indirectly engage in any such Competitive Business on your own account; or

           (iii)    become interested in any such Competitive Business, directly or indirectly, as an individual, partner, member, shareholder, director, officer, principal, agent, employee, consultant or in any other relationship or capacity; provided, that the purchase of a publicly traded security of a corporation engaged in such business or service shall not in itself be deemed violative of this Section so long as you do not own, directly or indirectly, more than 1% of the securities of such corporation.

      To the extent required by the laws of the state in which the Restaurant is located, the duration or the geographic areas included within the foregoing covenants, or both, shall be deemed amended in accordance with Section 25.(b).

      **(d)**    **Managerial and Supervisory Employees.**  You covenant that you shall cause all persons who are involved in managerial or supervisory positions with you to enter into a Confidentiality Agreement as provided or approved by us.  You agree to provide us with copies of such executed agreements upon request.  If you have reason to believe that any person has violated any such Confidentiality Agreement, you shall promptly notify us and cooperate with us to protect us against unfair competition, infringement, or other unlawful use of the Marks, our trade secrets, recipes, or System.  You further grant us the right, but not the obligation, to prosecute any such lawsuits at our expense in your name.

      **(e)**    **Copying; Non-Solicitation.**  You shall not copy or duplicate our System or any aspect thereof, or any of our trade secrets, recipes, methods of operation, processes, formulas, advertising, marketing, designs, trade dress, plans, software, programs, know-how or other proprietary ideas or information nor will you convey, divulge, make available or communicate any such information to any third party or assist others in doing so (except as permitted or required by this Agreement).  You covenant that you will not, either during the Term or after it, employ or seek to employ any person who is employed by us, our Affiliates

or by any of our franchisees, or otherwise directly or indirectly solicit, entice or induce any such person to leave their employment.

(f)     **Validity of Marks and Copyrights; Registrations.**  You agree that you will not, either during the Term or any time thereafter, directly or indirectly challenge or contest the validity of, or take any action to jeopardize our rights in or ownership of, any of the Marks or any registration of a Mark or any Copyrighted Work.  If you violate this provision, we shall be entitled to equitable, monetary and punitive remedies and any other relief that may be available under applicable law, as well as the recovery of all costs, expenses and attorneys' fees incurred by us as a result of such violation.

(g)     **Reasonableness of Scope and Duration.**  You agree that the covenants and agreements contained herein are, taken as a whole, reasonable with respect to the activities covered and their geographic scope and duration, and you shall not raise any issue of the reasonableness of the areas, activities or duration of any such covenants in any proceeding to enforce any such covenants.  You acknowledge and agree that you have other skills and resources and that the restrictions contained in this Section 16 will not hinder your activities or ability to make a living either under this Agreement or in general.

(h)     **Enforceability.**  You agree that we may not be adequately compensated by damages for a breach by you of any of the covenants and agreements contained in this Section, and that we shall, in addition to all other remedies, be entitled to injunctive relief and specific performance.  The covenants and agreements contained in this Section shall be construed as separate covenants and agreements, and if any court makes a final determination that the restraints provided for in any such covenants and agreements are too broad as to the area, activity or time covered, said area, activity or time covered may be reduced to whatever extent the court deems reasonable, and such covenants and agreements shall be enforced as to such reduced area, activity or time.

17.     **Trade Secrets and Confidential Information.**  You understand and agree that we have disclosed or will disclose to you certain confidential or proprietary information and trade secrets.  Except as necessary in connection with the operation of the Restaurant and as approved by us, you shall not, during the Term or at any time after the expiration or termination of the Franchise, regardless of the cause of termination, directly or indirectly, use for your own benefit or communicate or divulge to, or use for the benefit of any other person or entity, any trade secrets, confidential information, knowledge or know-how concerning the recipes, food products, advertising, marketing, designs, plans, software, programs or methods of operation of the Restaurant or the System.  You shall disclose to your employees only such confidential, proprietary or trade secret information as is necessary to operate your business hereunder and then only while this Agreement is in effect.  Any and all information, knowledge, or know-how, including without limitation, drawings, materials, equipment, marketing, recipes, and other data, that we designate as secret or confidential shall be deemed secret and confidential for purposes of this Agreement.

18.     **Insurance.**

**(a)** **Types and Extent of Coverage.** You shall obtain and maintain throughout the Term such insurance coverages with such limits as specified below (or such greater amounts of insurance as may be required by the terms of any lease or mortgage relating to the Premises) under policies issued by carriers rated "A-" or better by A.M. Best Company:

(i)   fire, extended coverage, vandalism, malicious mischief and special extended peril insurance at no less than the actual replacement value of the building (if owned), the contents, and improvements of the Restaurant;

(ii)   workers' compensation and other insurance required by law;

(iii)   commercial general liability insurance on an "occurrence" form covering all operations by or on behalf of you, providing insurance for bodily injury liability, property damage liability and personal injury liability for the limits of liability indicated below and including coverage for:

(A)   Premises and Operations Liability;

(B)   Products and Completed Operations Liability;

(C)   Independent Contractors Protective Liability;

(D)   Blanket Contractual Liability insuring the obligations assumed by you under this Agreement; and

(E)   Incidental Medical Malpractice;

(iv)   automobile liability insurance, including non-owned automobiles, with limits of liability not less than $1,000,000 combined single limit each accident for bodily injury and property damage combined; and

(v)   fire legal liability, with a minimum coverage limit of $500,000, unless you own the Premises or have a cross-waiver of subrogation with your landlord.

The limits of liability required for the policies specified in (iii) above are:  $1,000,000 each occurrence (combined single limit for bodily injury and property damage); $1,000,000 personal injury liability; $1,000,000 aggregate for products - completed operations; and $2,000,000 general aggregate.  Except with respect to bodily injury and property damage included within the products and completed operations hazards, the aggregate limit must apply separately to each location if you operate at more than one location pursuant to multiple franchise agreements with us.  You are also required to maintain an umbrella policy with a minimum of $1,000,000 of coverage each occurrence, which must expressly provide coverage above the coverages listed above.  We must be named as an additional insured on all your policies.  These are only the minimum coverages required.  We do not represent or warrant that these coverages are adequate.  You should consult with your insurance advisors to assure that you obtain all

required coverages as well as any additional types of coverages or higher limits that they may recommend.

**(b)** **Other Insurance Requirements.**  Upon request, you shall deliver to us copies of all such policies of insurance and proof of payment therefor.  All policies required hereunder shall provide that the insurer will endeavor to give us written notice not less than 30 days prior to the date the coverage is canceled, altered, or permitted to lapse or expire.  We may, from time to time, increase the limits of any required policy of insurance.

## 19.   **Termination by Us.**

**(a)** **Automatic Termination.**  You shall be in default under this Agreement, and the Franchise and all rights granted to you in this Agreement shall automatically terminate without notice to you, if:  (i) you make a general assignment for the benefit of creditors, or a petition in bankruptcy is filed by you; (ii) such a petition is filed against and not opposed by you; (iii) you are adjudicated as bankrupt or insolvent; (iv) a bill in equity or other proceeding is filed for the appointment of a receiver or other custodian for your business or assets and consented to by you; (v) a receiver or other custodian (permanent or temporary) of your assets or property, or any part thereof, is appointed by any court of competent jurisdiction; (vi) proceedings for a composition with creditors under any state or federal law are instituted by or against you; (vii) a final judgment against you remains unsatisfied or of record for 30 days or longer (unless an appeal or supersedeas bond is filed); (viii) you are liquidated or dissolved; (ix) any portion of your interest in the Franchise becomes subject to an attachment, garnishment, levy or seizure by any creditor or any other person claiming against or in your rights; (x) execution is levied against your business or property; or (xi) the real or personal property of your Restaurant is sold after levy thereupon by any sheriff, marshal, or constable.

**(b)** **Upon Notice.**  You shall be in default and we may, at our option, terminate the Franchise and all rights granted in this Agreement, without affording you any opportunity to cure the default, effective upon the earlier of receipt of notice of termination by you, or five days after mailing of such notice by us, upon the occurrence of any of the following events:

(i)   at any time you cease to operate or otherwise abandon the Restaurant or forfeit the right to do or transact business in the jurisdiction where the Restaurant is located or lose the right to possession of the Premises; provided however, that if any such loss of possession results from the governmental exercise of the power of eminent domain or if, through no fault of yours, the Premises are damaged or destroyed, then you shall have 45 days after either such event in which to apply for our approval to relocate or reconstruct the premises of the Restaurant (which approval shall not be unreasonably withheld), provided, that you shall either relocate or begin and diligently pursue reconstruction of the Restaurant within 60 days after the event;

(ii)   except as otherwise permitted in Sections 14 and 15, any owner of more than a 5% interest in you transfers all or part of such interest or you transfer any interest in the Franchise or a material portion of your assets or the assets of the Restaurant without our prior written consent;

(iii)   you, or any person or entity owning more than 5% of you, are (or is) proven to have engaged in fraudulent conduct or are (or is) convicted of, or pleads guilty or no contest to, a felony or a crime involving moral turpitude or any other crime or offense that is reasonably likely to have an adverse effect on the Chain, the Marks or the goodwill associated therewith; provided, that if the act or conviction involves your owner, we will not terminate the Franchise if you notify us promptly after you learn of the event constituting the default and within 15 days of the date of the notice, either:  (A) the person or entity that committed the wrongful act divests his, her or its entire interest in you; or (B) you obtain our consent for such owner to maintain his, her or its ownership interest;

(iv)   an approved transfer is not effected within 9 months of your death or incapacity, or the death, incapacity or dissolution of any owner of an interest in you;

(v)   you make any intentional, unauthorized disclosure or divulgence of the contents of any Manual or other confidential information provided to you by us;

(vi)   you are given 3 or more notices of being in material violation of any of the terms or requirements of this Agreement within any 12-month period, whether or not such defaults are timely cured after notice;

(vii)   you fail to comply with any of your covenants set forth in Sections 16 or 17, fail to maintain the insurance coverages under Section 18, or make any material misrepresentation to us or breach any warranty or representation made to us, whether in this Agreement or otherwise;

(viii)   you knowingly or intentionally maintain false books or records or submit any false record, statement or report to us;

(ix)   you, by act or omission, materially impair the value of, or the goodwill associated with, the Chain, any of the Marks or the System;

(x)   any other Franchise Agreement or Development Agreement between you and us is terminated as a result of your breach or default; or

(xi)   an imminent threat or danger to public health or safety results from the construction, maintenance, or operation of the Restaurant.

(c)   **Upon Notice and Failure to Cure.**  In addition to those defaults provided for under subsections (a) or (b) above, you shall be in default hereunder for any failure to maintain or comply with any of the terms, covenants, specifications, standards, procedures or requirements imposed by this Agreement or in any Manual, policy or procedure statement or other written document provided by us, or to carry out the terms of this Agreement in good faith.  Except as provided under subsections (a) or (b) above, we will provide you with written notice and 15 days to cure or, if a default cannot reasonably be cured within 15 days, to begin within that time substantial and continuing action to cure such default and to provide us with evidence of such actions.  If the defaults specified in such notice are not cured within the 15-day

period, or if substantial and continuing action to cure has not been initiated, we may, at our option, terminate the Franchise effective on the earlier of the date of receipt by you of notice of termination or 5 days after the mailing of such notice by us. Such defaults shall include, without limitation, the occurrence of any of the following events:

(i)      you fail to construct, remodel, or commence operating the Restaurant in accordance with this Agreement;

(ii)      you fail, refuse, or neglect to promptly pay any monies owing to us, our Affiliates or the Marketing Fund or a Cooperative when due, or to submit the financial or other information required under this Agreement;

(iii)      any person or entity owning 5% or less of you transfers such interest in violation of this Agreement; provided, however, that your right to cure such a default shall be conditioned upon you immediately notifying us of the improper transfer and taking all actions necessary to either (A) obtain our approval thereof or (B) if approval is not desired or the transfer or transferee is not approved by us, to re-acquire the interest so transferred;

(iv)      you misuse or make any unauthorized use of the Marks;

(v)      you, by act or omission in connection with the operation of the Restaurant, permit a continuing violation of any applicable law, ordinance, rule, or regulation of a governmental body (and, in the case of any law, ordinance, rule or regulation for public health or safety, we shall have the right to require you to close the Restaurant until the cure is effected); or

(vi)      you commit a material breach of the lease for the Premises or suffer or permit the existence of any condition that could result in your default or material breach of such lease.

(d)      **Materiality of Breaches.**  You acknowledge and agree that a breach or violation of any term, covenant, condition, warranty, representation or other obligation by you (other than a breach or violation that may be cured under Section 19.(c) and is in fact cured within 15 days after notice) shall constitute a material breach and default under this Agreement. Any breach or violation that may be cured under Section 19.(c) and that is not in fact cured within the 15-day cure period shall also constitute a material breach and default under this Agreement.

20.      **Obligations upon Termination or Expiration.**

(a)      **Post Termination Obligations.**  Upon termination or expiration of the Franchise, all rights granted to you under this Agreement shall terminate, the Franchise shall revert to us, and you shall have the following obligations with respect to the Restaurant franchised under this Agreement:

(i)       You shall immediately cease to operate the business franchised under this Agreement, and shall not thereafter, directly or indirectly, represent to the public or hold yourself out as a Papa John's franchisee with respect to such business.

(ii)      You shall immediately and permanently cease to use, in any manner whatsoever, all confidential information, Designated Software, website, methods, procedures and techniques used by or associated with the System, and the proprietary Marks "Papa John's," "Papa John's Pizza," and all other Marks and distinctive forms, slogans, signs, symbols, logos and devices associated with the Papa John's Chain.

(iii)     You shall immediately return to us any property held or used by you that is owned by us and shall cease to use, and either destroy or convey to us, all signs, advertising materials, displays, stationery, forms and any other materials that bear or display the Marks.

(iv)     You shall take such actions as may be necessary to cancel any assumed name or similar registration that contains the mark "Papa John's" or "Papa John's Pizza" or any other Mark, and you shall furnish us with evidence satisfactory to us of compliance with this obligation within thirty (30) days after termination or expiration of the Franchise.

(v)      You shall, if we elect to purchase the assets of the Restaurant pursuant to Section 20.(b) below, assign to us any interest that you have in any lease for the Premises; provided that we agree to use reasonable efforts to effect a termination of the existing lease for the Premises and enter into a new lease on reasonable terms with the landlord.  If we are unable to negotiate an acceptable new lease, we will indemnify and hold you harmless from any ongoing liability under the lease from the date on which we assume possession of the Premises.  The assignment of the lease shall be made at the same time as we purchase the assets of the Restaurant pursuant to Section 20.(b).   If we do not elect to purchase the assets of the Restaurant, you shall, within 10 days after termination or expiration of the Franchise, make such modifications and alterations to the Premises as may be necessary to distinguish the appearance of the Premises from that of other Papa John's restaurants and make such specific additional changes thereto as we may reasonably request.

(vi)     You shall promptly pay all sums owed to us and our Affiliates, and if the Franchise is terminated for any reason other than as a result of a material breach of this Agreement by us that is not cured within 30 days or such longer period as may be necessary after written notice thereof from you, such sums shall include all damages, costs, and expenses, including reasonable attorneys' fees, incurred by us as a result of the default and the termination, which obligation shall give rise to and remain, until paid in full, a lien in favor of us against any and all of the personal property, furnishings, equipment, signs, fixtures and inventory owned by you and located on the Premises on the date the Franchise terminated and we shall have the right to set off against and deduct any amounts owed to you by us or any of our Affiliates any or all sums owed to us or our Affiliates that remain unpaid 30 days after termination or expiration of this Agreement.

(vii)    You shall pay to us all damages, costs and expenses, including reasonable attorneys' fees, incurred by us subsequent to the termination or expiration of the Franchise in obtaining injunctive or other relief for the enforcement of any term, covenant or provision of this Agreement.

(viii)    You shall immediately deliver to us all Manuals, policy and procedure statements, instructions, and other materials related to operating the Restaurant, including, without limitation, brochures, charts and any other materials provided by us and all copies thereof, and you shall neither retain nor convey to another any copy or record of any of the foregoing and shall allow us to remove the Designated Software as described in Section 10.(c)(iii)(E).

(ix)    If requested by us, you shall take all further action and execute all documents necessary to convey and assign to us all telephone numbers that have been used in the operation of the Restaurant or if we do not so request, you shall cease all use of such telephone numbers.

(x)    You shall comply with the covenants contained in this Agreement, including, but not limited to, the covenants not to compete and the covenants not to disclose trade secrets or confidential information contained in Sections 16 and 17.

(b)    **Asset Purchase Option.**  Upon termination of this Agreement by us, upon termination of this Agreement by you without cause or upon expiration of this Agreement, we shall have the option, exercisable by giving written notice thereof within 15 days from the date of such expiration or termination, to purchase from you all the assets used in the Restaurant. Assets shall include, without limitation, leasehold improvements, equipment (including the Information System), furniture, fixtures, signs and inventory for the Restaurant.  We shall have the unrestricted right to assign this option to purchase.  We or our assignee shall be entitled to all customary warranties and representations given by the seller of a business including, without limitation, representations and warranties as to:  (i) ownership, condition and title to assets; (ii) liens and encumbrances relating to the assets; and (iii)  validity of contracts  and liabilities inuring to us or affecting the assets, contingent or otherwise.  The purchase price for the assets of the Restaurant shall be the fair market value thereof, determined as of the date of termination or expiration of this Agreement in a manner consistent with reasonable depreciation of leasehold improvements owned by you and the equipment, furniture, fixtures, signs and inventory of the Restaurant, provided that the purchase price shall not contain any factor or increment for any trademark, service mark or other commercial symbol used in connection with the operation of the Restaurant, or any goodwill or "going concern" value for the Restaurant; and further provided that we may exclude from the assets purchased hereunder any equipment, furniture, fixtures, signs and inventory that do not, as determined by us in our sole discretion, meet quality standards for Papa John's restaurants.  If you and we are unable to agree on the fair market value of the assets, the fair market value shall be determined by an independent appraiser selected by us and you.  If you and we are unable to agree on a single appraiser, each party shall select one appraiser, who shall select a third appraiser, and the fair market value shall be deemed to be the average of the three (3) independent appraisals.  The fees and costs of such appraiser or appraisers shall be borne equally by you and us.  Except as provided above, nothing

-38-

contained herein shall restrict the manner in which the appraisers so selected value the leasehold improvements, equipment, furniture, fixtures, signs and inventory. The purchase price shall be paid in cash, a cash equivalent, or marketable securities of equal value at the closing of the purchase, which shall take place no later than 90 days after receipt by you of notice of exercise of this option to purchase, at which time you shall deliver instruments transferring to us or our assignee: (1) good and merchantable title to the assets purchased, free and clear of all liens and encumbrances (other than liens and security interests acceptable to us or our assignee), with all sales and other transfer taxes paid by you; and (2) all licenses and permits of the Restaurant that may be assigned or transferred. If you cannot deliver clear title to all of the purchased assets as aforesaid, or in the event there shall be other unresolved issues, the closing of the sale shall be accomplished through an escrow. Further, you and we shall, prior to closing, comply with all applicable legal requirements, including the bulk sales provisions of the Uniform Commercial Code of the state in which the Restaurant is located. We shall have the right to set off against and reduce the purchase price by any and all amounts owed by you to us or our Affiliates, and the amount of any encumbrances or liens against the assets or any obligations assumed by us. You and each owner of an interest in you shall indemnify us against all liabilities not so assumed. If we or our assignee exercise this option to purchase, pending the closing of such purchase as hereinabove provided, we shall have the right to appoint a manager to maintain the operation of the Restaurant as set forth under Section 15.(b). Alternatively, we may require you to close the Restaurant during such time period without removing any assets from the Restaurant. You shall maintain in force all insurance policies required pursuant to this Agreement, until the closing on the sale.

### 21. Independent Contractor; Indemnification.

(a) **Independent Contractor.** It is understood and agreed by the parties that this Agreement creates only a contractual relationship between the parties subject to normal rules of contract law. This Agreement does not create a fiduciary relationship between us and you and you are and shall remain an independent contractor. Nothing in this Agreement is intended to constitute either party an agent, legal representative, subsidiary, joint venturer, partner, employee, or servant of the other for any purpose whatsoever. You agree to hold yourself out to the public as an independent contractor, separate and apart from us. You agree that you shall not make any contract, agreement, warranty or representation on our behalf without our prior written consent, and you agree that you shall not incur any debt or other obligation in our name. This Agreement shall not be deemed to confer any rights or benefits to any person or entity not expressly named herein.

(b) **Business Management.** You agree and acknowledge that: (i) we will have no responsibility for the day-to-day operations of the Restaurant or the management of your business, including without limitation, ensuring the safety and security of your customers or employees; (ii) you shall independently control the operation of your business and the results of your operations will depend almost exclusively on your business acumen and promotional and managerial efforts; and (iii) we have no responsibility for or control or supervision of your employment practices.

**(c)    Indemnification.**  We shall not be liable by reason of any act or omission by you in your operation of the Restaurant or for any claim, cause of action or judgment arising therefrom against you or us.  You agree to hold harmless, defend and indemnify us and our Affiliates, and our and their respective shareholders, officers, directors, agents, and employees, from and against any and all losses, expenses, judgments, claims, costs (including reasonable attorney fees) and damages arising out of or in connection with any claim or cause of action in which we are or become a named defendant and that arises, directly or indirectly, out of the construction or operation of, or in connection with, your Restaurant, other than a claim finally determined to have resulted directly from our negligence.

22.    **Your Representations.**  You hereby acknowledge and represent that:

**(a)**    All information submitted to us by you or those owning an interest in you, including all applications, financial statements and other documents and information, is true and correct in all respects and does not omit any material statement or item of fact necessary to make the statements therein not false or misleading.

**(b)**    We have not represented to you that:  (i) you will earn, can earn, or are likely to earn a gross or net profit; (ii) we have knowledge of the relevant market; or (iii) the market demand will enable you to earn a profit from the Franchise.

**(c)**    You have read and understood this Agreement and the disclosure document entitled "Papa John's Franchise Offering Circular" (the "Offering Circular") required by the Federal Trade Commission and/or the state in which the Restaurant will be located.  You understand that we make no representation or warranty regarding your relevant market or the profitability of business operations under the System and that no representations have been made by us, or by any of our Affiliates or our or their officers, directors, shareholders, employees or agents, that are contrary to or inconsistent with the terms of this Agreement or with the statements made in the Offering Circular that accompanied a copy of this Agreement.

**(d)**    You accept the terms, conditions and covenants contained in this Agreement as being reasonable and necessary to maintain our standards of quality, service and uniformity and in order to protect and preserve the goodwill of the Marks.  You acknowledge that other franchisees of ours have been or will be granted franchises at different times and in different situations.  You further acknowledge that the provisions of the franchise agreements pursuant to which such franchises were granted may vary materially from those contained in this Agreement and that your obligation arising hereunder may differ substantially from other franchisees.

**(e)**    You recognize that the System may evolve and change over time and that the Franchise involves an investment of substantial risk and its success is dependent primarily upon your business acumen and your efforts and other factors beyond our control.  You have conducted an independent investigation of the Franchise and have had ample time and opportunity to consult with independent professional advisors (lawyers, accountants, etc.), and have not received or relied upon any express or implied guarantee as to potential volumes, revenues, profits or success of the business venture contemplated by the Franchise.

-40-

**(f)** Neither you nor any shareholder, member or other holder of any ownership interest in you is subject to or has entered into any other agreement, promise, representation, warranty, covenant, court order or other legal or equitable obligation that conflicts with this Agreement or prohibits or limits your entering into this Agreement or your ability to perform your obligations under this Agreement.

23. **ENFORCEMENT.**

**(a)** **ARBITRATION. EXCEPT FOR CONTROVERSIES, DISPUTES OR CLAIMS RELATED TO OR BASED ON: (1) ANY ACTION BY US TO STOP OR PREVENT ANY THREAT OR DANGER TO PUBLIC HEALTH OR SAFETY RESULTING FROM THE CONSTRUCTION, MAINTENANCE, OR OPERATION OF THE RESTAURANT; (2) ANY DEBT COLLECTION ACTION BY US OR ANY OF OUR AFFILIATES; OR (3) AT OUR OPTION, YOUR VIOLATION OF ANY PROVISION OF SECTION 16 OR 17 HEREOF, OR YOUR USE OF THE MARKS AFTER THE EXPIRATION OR TERMINATION OF THIS AGREEMENT; ALL CONTROVERSIES, DISPUTES OR CLAIMS BETWEEN US (INCLUDING OUR AFFILIATES, SHAREHOLDERS, OFFICERS, DIRECTORS, AGENTS OR EMPLOYEES) AND YOU (INCLUDING YOUR OWNERS, GUARANTORS, AFFILIATES AND EMPLOYEES, IF APPLICABLE) ARISING OUT OF OR RELATED TO:**

**(i)** **THIS AGREEMENT OR ANY OTHER AGREEMENT BETWEEN YOU AND US OR ANY PROVISION OF ANY SUCH AGREEMENT;**

**(ii)** **OUR RELATIONSHIP WITH YOU, INCLUDING ISSUES RELATING TO OUR DECISION TO TERMINATE THAT RELATIONSHIP;**

**(iii)** **THE VALIDITY OF THIS AGREEMENT OR ANY OTHER AGREEMENT BETWEEN YOU AND US OR ANY PROVISION OF ANY SUCH AGREEMENT; OR**

**(iv)** **ANY STANDARD, SPECIFICATION OR OPERATING PROCEDURE RELATING TO THE ESTABLISHMENT OR OPERATION OF THE RESTAURANT**

**WILL BE SUBMITTED FOR BINDING ARBITRATION TO THE LOUISVILLE, KENTUCKY OFFICE OF RETIRED JUDGES MEDIATION & ARBITRATION ("RJMA") ON DEMAND OF EITHER PARTY. SUCH ARBITRATION PROCEEDING WILL BE CONDUCTED IN LOUISVILLE, KENTUCKY AND, EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, WILL BE HEARD BY ONE ARBITRATOR IN ACCORDANCE WITH THE THEN CURRENT FRANCHISING ARBITRATION RULES, IF ANY, OR OTHERWISE BY THE THEN CURRENT COMMERCIAL ARBITRATION RULES OF RJMA. ALL MATTERS RELATING TO ARBITRATION WILL BE GOVERNED BY THE FEDERAL ARBITRATION ACT (9 U.S.C. §§ 1 ET SEQ.) AND NOT BY ANY STATE ARBITRATION LAW.**

THE ARBITRATOR WILL HAVE THE RIGHT TO AWARD OR INCLUDE IN THE AWARD ANY RELIEF THAT THE ARBITRATOR DEEMS PROPER IN THE CIRCUMSTANCES, INCLUDING, WITHOUT LIMITATION, MONEY DAMAGES (WITH INTEREST ON UNPAID AMOUNTS FROM THE DATE DUE OR DATE DAMAGES ARISE OR ARE INCURRED), SPECIFIC PERFORMANCE, INJUNCTIVE RELIEF AND ATTORNEYS' FEES AND COSTS, PROVIDED THAT THE ARBITRATOR WILL NOT HAVE THE RIGHT TO DECLARE ANY MARK GENERIC OR OTHERWISE INVALID OR, EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, TO AWARD EXEMPLARY OR PUNITIVE DAMAGES.  THE AWARD AND DECISION OF THE ARBITRATOR WILL BE CONCLUSIVE AND BINDING UPON ALL PARTIES HERETO, AND JUDGMENT UPON THE AWARD MAY BE ENTERED IN ANY COURT OF COMPETENT JURISDICTION.

WE AND YOU AGREE TO BE BOUND BY THE PROVISIONS OF ANY LIMITATION ON THE PERIOD OF TIME IN WHICH CLAIMS MUST BE BROUGHT UNDER APPLICABLE LAW OR THIS AGREEMENT, WHICHEVER EXPIRES EARLIER.  WE AND YOU FURTHER AGREE THAT, IN CONNECTION WITH ANY SUCH ARBITRATION PROCEEDING, EACH PARTY MUST SUBMIT OR FILE ANY CLAIM THAT WOULD CONSTITUTE A COMPULSORY COUNTERCLAIM (AS DEFINED BY RULE 13 OF THE FEDERAL RULES OF CIVIL PROCEDURE) WITHIN THE SAME PROCEEDING AS THE CLAIM TO WHICH IT RELATES.  ANY SUCH CLAIM THAT IS NOT SUBMITTED OR FILED AS DESCRIBED ABOVE WILL BE FOREVER BARRED.

WE AND YOU AGREE THAT, EXCEPT FOR INCLUSION OF RELATED PARTIES AS EXPRESSLY PROVIDED IN THIS SECTION 23.(a), ARBITRATION WILL BE CONDUCTED ON AN INDIVIDUAL, NOT A CLASS-WIDE, BASIS AND THAT AN ARBITRATION PROCEEDING BETWEEN US (INCLUDING OUR AFFILIATES, SHAREHOLDERS, OFFICERS, DIRECTORS, AGENTS OR EMPLOYEES) AND YOU (INCLUDING YOUR OWNERS, GUARANTORS, AFFILIATES OR EMPLOYEES, IF APPLICABLE) MAY NOT BE CONSOLIDATED WITH ANY OTHER ARBITRATION PROCEEDING BETWEEN US AND ANY OTHER PERSON, CORPORATION, LIMITED LIABILITY COMPANY OR PARTNERSHIP.

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS SECTION, WE AND YOU EACH HAVE THE RIGHT IN A PROPER CASE TO BRING AN ACTION TO OBTAIN A TEMPORARY RESTRAINING ORDER OR TEMPORARY OR PRELIMINARY INJUNCTIVE RELIEF FROM A COURT OF COMPETENT JURISDICTION, PROVIDED, THAT WE AND YOU MUST CONTEMPORANEOUSLY SUBMIT OUR DISPUTE FOR ARBITRATION ON THE MERITS AS PROVIDED HEREIN, EXCEPT AS OTHERWISE PROVIDED IN THE FIRST PARAGRAPH OF THIS SECTION 23.(a).

THE PROVISIONS OF THIS SECTION ARE INTENDED TO BENEFIT AND BIND CERTAIN THIRD PARTY NON-SIGNATORIES AND WILL CONTINUE IN FULL

**FORCE AND EFFECT SUBSEQUENT TO AND NOTWITHSTANDING THE EXPIRA-TION OR TERMINATION OF THIS AGREEMENT.**

**(b)    GOVERNING LAW.   ALL MATTERS RELATING TO ARBITRA-TION WILL BE GOVERNED BY THE UNITED STATES FEDERAL ARBITRATION ACT (9 U.S.C. §§1 ET SEQ). EXCEPT TO THE EXTENT GOVERNED BY THE FEDERAL ARBITRATION ACT, THE UNITED STATES TRADEMARK ACT OF 1946 (LANHAM ACT, 15 U.S.C. SECTIONS 1051 ET SEQ.) OR OTHER APPLICABLE PREEMPTIVE FEDERAL LAW, THIS AGREEMENT AND ALL CLAIMS ARISING FROM THE RELA-TIONSHIP BETWEEN US AND YOU WILL BE GOVERNED BY THE LAWS OF THE COMMONWEALTH OF KENTUCKY, WITHOUT REGARD TO ITS CONFLICT OF LAWS PRINCIPLES.**

**(c)    CONSENT TO JURISDICTION AND VENUE.   YOU AND YOUR OWNERS AGREE THAT ALL JUDICIAL ACTIONS BROUGHT BY US AGAINST YOU OR YOUR OWNERS OR BY YOU OR YOUR OWNERS AGAINST US OR OUR SUBSIDI-ARIES, AFFILIATES, SHAREHOLDERS, OFFICERS, DIRECTORS, AGENTS OR EMPLOYEES MUST BE BROUGHT IN A COURT OF COMPETENT JURISDICTION IN JEFFERSON COUNTY, KENTUCKY OR FEDERAL DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY, LOUISVILLE DIVISION, AND YOU (AND EACH OWNER) IRREVOCABLY SUBMIT TO THE JURISDICTION OF SUCH COURTS AND WAIVE ANY OBJECTION YOU, HE OR SHE MAY HAVE TO EITHER THE JURISDIC-TION OF OR VENUE IN SUCH COURTS. NOTWITHSTANDING THE FOREGOING, WE MAY BRING AN ACTION TO OBTAIN A RESTRAINING ORDER OR TEMPORARY OR PRELIMINARY INJUNCTION, OR ENFORCE AN ARBITRATION AWARD, IN ANY FEDERAL OR STATE COURT OF GENERAL JURISDICTION IN THE STATE IN WHICH YOU RESIDE OR IN WHICH THE RESTAURANT IS LOCATED.**

**(d)    WAIVER OF PUNITIVE DAMAGES. EXCEPT WITH RESPECT TO YOUR OBLIGATION TO INDEMNIFY US PURSUANT TO SECTION 21 AND CLAIMS WE BRING AGAINST YOU UNDER SECTIONS 16.(c), 16.(f) AND 17, WE AND YOU AND YOUR OWNERS WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT TO OR CLAIM FOR ANY PUNITIVE OR EXEMPLARY DAMAGES AGAINST THE OTHER AND AGREE THAT, IN THE EVENT OF A DISPUTE BETWEEN US, THE PARTY MAKING A CLAIM WILL BE LIMITED TO EQUITABLE RELIEF AND TO RECOVERY OF ANY ACTUAL DAMAGES IT SUSTAINS (INCLUDING PRE-JUDG-MENT INTEREST).**

**(e)    WAIVER OF JURY TRIAL. WE AND YOU IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER OF US.**

**(f)    LIMITATIONS OF CLAIMS. EXCEPT FOR CLAIMS BROUGHT BY US WITH REGARD TO YOUR OBLIGATIONS UNDER SECTIONS 16 AND 17, AND YOUR OBLIGATION TO INDEMNIFY US PURSUANT TO SECTION 21, ANY AND ALL CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE**

**RELATIONSHIP OF YOU AND US PURSUANT TO THIS AGREEMENT WILL BE BARRED UNLESS AN ACTION IS COMMENCED WITHIN ONE (1) YEAR FROM THE DATE ON WHICH THE ACT OR EVENT GIVING RISE TO THE CLAIM OCCURRED, OR ONE (1) YEAR FROM THE DATE ON WHICH YOU OR WE KNEW OR SHOULD HAVE KNOWN, IN THE EXERCISE OF REASONABLE DILIGENCE, OF THE FACTS GIVING RISE TO SUCH CLAIMS, WHICHEVER LATER OCCURS.**

   **(g)** **Costs, Expenses and Attorneys' Fees.** Except as provided in Sections 16.(f), 20 and 21, each party shall pay its own costs, expenses and attorneys' fees in any arbitration, claim, suit or proceeding arising out of this Agreement or the franchise relationship of the parties.

   **24.** **Notices.** All notices, requests, demands and other communications required or permitted to be given or made under this Agreement shall be in writing and shall be given: (i) by personal delivery; or (ii) provided such notice, request, demand or communication is actually received by the party to which it is addressed in the ordinary course of delivery, by deposit in the United States mail, postage prepaid; or (iii) by registered or certified mail, return receipt requested, postage prepaid, or by delivery to a nationally-recognized overnight courier service; in each case addressed as follows, or to such other person or entity as either party may designate by notice to the other in accordance herewith:

   Us:    If by Mail:
         P.O. Box 99900
         Louisville, Kentucky 40269-0900
         ATTN:  General Counsel

         If by Courier or Personal Delivery:
         2002 Papa John's Boulevard
         Louisville, Kentucky  40299-2367
         ATTN:  General Counsel

   You:    _____
         _____
         ATTN:  _____

   **25.** **Miscellaneous.**

   **(a)** **Insolvency Proceeding.** In any event described in Section 19.(a) (an "Insolvency Proceeding"), the following provisions shall apply:

      **(i)** **Fees and Expenses.** In the event of any Insolvency Proceeding, you shall pay all reasonable fees and expenses (including attorneys' fees) incurred by us or our Affiliates in:  (A) advising, structuring, drafting, reviewing, administering or amending the Agreement and/or (B) terminating, enforcing or otherwise protecting our rights under the Agreement in such Insolvency Proceeding, irrespective of whether suit is brought by or against us (the "Insolvency Expenses").

(ii)     **Enforcement of Agreement in Insolvency Proceeding.**  In the event that you continue to operate the Franchise and otherwise continue to accept the benefits of the agreement during the pendency of any Insolvency Proceeding, you agree that you will remain bound by each term and provision of the Agreement and that you will be benefitted by the continued use and enjoyment of the rights and benefits provided to you by and under the Agreement.  You further agree that the value of such ongoing benefit is equal to the amount(s) payable under the Agreement and so long as you continue to operate the Franchise and otherwise continue to accept the benefits of the Agreement during the pendency of any Insolvency Proceeding, you shall pay all of the amounts due under the Agreement in the manner provided by this Agreement in a time manner.

(iii)     **Assumption and/or Assignment of Agreement.**  You agree that in any Insolvency Proceeding, the Agreement cannot be assigned and/or assumed under 11 U.S.C. Sections 363 or 365 or otherwise, without our express written consent, which consent can be given or withheld in our sole and absolute discretion.  You also agree that in order to assume and/or assign the Agreement in any Insolvency Proceeding, the defaults which must be cured as an express condition to such assumption and/or assignment and otherwise in accordance with 11 U.S.C. Section 365(b)(1) include, but are not necessarily limited to, the Insolvency Expenses plus all amounts due from you to:  (A) Papa John's, (B) any and all Affiliate(s) of Papa John's, (C) PJFS, and (D) the Papa John's Marketing Fund, Inc. or Papa Card, Inc., whether the amounts due from you arise under this Agreement or otherwise.

(iv)     **Rejection of Agreement.**  You agree that the rejection of the Agreement in any Insolvency Proceeding, whether pursuant to 11 U.S.C. 365 or otherwise, will result in a termination of the Agreement and a revocation and reversion of all of the rights provided to you under the Agreement to us.

(b)     **Tolling; Severability.**  During any period in which any covenant in Section 16 or 17 is being breached by you, including any period in which we or you are seeking administrative or judicial enforcement, interpretation or modification of any such covenant, and all appeals thereof, the Restricted Period shall toll and be suspended.  You agree to be bound to the maximum extent permitted by law that is subsumed within the terms of any provision hereof, as though it were separately articulated in and made a part of this Agreement, that may result from the striking of any provision hereof by a court, or that a court holds to be unenforce- able in a final decision to which we are a party, or that may result from reducing the scope of any provision to the extent required to comply with a court order or with any applicable state or federal law, whether currently in effect or subsequently enacted.

(c)     **Construction.**  All references herein to the masculine, neuter or singular shall be construed to include the masculine, feminine, neuter or plural, as the case may require.  All acknowledgements, warranties, representations, covenants, agreements and obligations herein made or undertaken by you shall be deemed jointly and severally undertaken by all those executing this Agreement as you.

(d)     **Entire Agreement.**  This Agreement, the documents incorporated herein by reference and the Exhibits attached hereto, constitute the entire agreement between the

-45-

parties, and all prior understandings or agreements concerning the subject matter hereof are canceled and superseded by this Agreement.  The Exhibits to this Agreement are incorporated herein by reference and made a part hereof as if set out in full herein.

**(e)**     **Affiliate.**  As used in this Agreement, the term "Affiliate" shall mean any person or entity that is owned or controlled by us or that owns or controls us or is under common control with us, directly or through one or more intermediaries.

**(f)**     **Amendments.**  Except for those permitted to be made unilaterally by us, no supplement, amendment or variation of the terms of this Agreement shall be valid unless made in writing and signed by the parties hereto.

**(g)**     **Waivers.**  No failure by us to exercise any right given to us hereunder or to insist upon strict compliance by you with any obligation, agreement or undertaking hereunder, and no custom or practice of the parties at variance with the terms hereof, shall constitute a waiver of our right to demand full and exact compliance by you with the terms hereof. Waiver by us of any particular default by you shall not affect or impair our rights with respect to any subsequent default of the same or of a different nature, nor shall any delay or omission by us to exercise any right arising from such default affect or impair our rights as to such default or any subsequent default.

**(h)**     **Counterparts.**  This Agreement may be executed in several counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

**(i)**     **Headings.**  The headings used in this Agreement are for convenience only, and the paragraphs shall be interpreted as if such headings were omitted.

**(j)**   **Time of Essence.**   You agree and acknowledge that time is of the essence with regard to your obligations hereunder and that all of your obligations are material to us and this Agreement.

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Agreement on the date first written above.

**PAPA JOHN'S INTERNATIONAL, INC.**

By: _____

Title: _____


_____

FRANCHISEE

By: _____

Title: _____

# PAPA JOHN'S

## FRANCHISE AGREEMENT

### EXHIBIT A

### ADDENDUM TO LEASE

**THIS ADDENDUM TO LEASE**, dated _____ __, 20___, is entered into by and between _____ ("Lessor"), and _____ ("Lessee").

### RECITALS:

A.    The parties hereto have entered into a certain Lease Agreement, dated _____ __, 20___, and pertaining to the premises located at _____ _____ (the "Lease").

B.    Lessor acknowledges that Lessee intends to operate a Papa John's restaurant in the leased premises (the "Premises") under a Papa John's Franchise Agreement (the "Franchise Agreement") with Papa John's International, Inc. ("PJI").

C.    The parties now desire to amend the Lease in accordance with the terms and conditions contained herein.

### AGREEMENT:

**NOW, THEREFORE,** it is hereby mutually covenanted and agreed between Lessor and Lessee as follows:

1.    **Remodeling and Decor**.  Lessor agrees that Lessee shall have the right to remodel, equip, paint and decorate the interior of the Premises and to display such proprietary marks and signs on the interior and exterior of the Premises as Lessee is reasonably required to do pursuant to the Franchise Agreement and any successor Franchise Agreement under which Lessee may operate a Papa John's business in the Premises.

2.    **Assignment**.  Lessee shall have the right to assign all of its right, title and interest in the Lease to PJI or any Affiliate of PJI at any time during the term of the Lease, including any extensions or renewals thereof, without first obtaining Lessor's consent.  However, no assignment shall be effective until such time as PJI or its designated Affiliate gives Lessor written notice of its acceptance of such assignment, and nothing contained herein or in any other

document shall constitute PJI or its designated Affiliate a party to the Lease, or guarantor thereof, and shall not create any liability or obligation of PJI or any Affiliate of PJI unless and until the Lease is assigned to, and accepted in writing by, PJI or its designated Affiliate.

3.      **Default and Notice**.

(a)      In the event there is a default or violation by Lessee under the terms of the Lease, Lessor shall give Lessee and PJI notice of such default or violation within a reasonable time after Lessor receives knowledge of its occurrence.

(b)      All notices to PJI shall be sent by registered or certified mail, postage prepaid, to the following address:

> Papa John's International, Inc.
> P.O. Box 99900
> Louisville, Kentucky 40269-0900
> Attn:  General Counsel

PJI may change its address for receiving notices by giving Lessor written notice of such new address.  Lessor agrees that it will notify both Lessee and PJI of any change in Lessor's mailing address to which notices should be sent.

4.      **Termination or Expiration**.  Upon the expiration or termination of either the Lease or the Franchise Agreement, Lessor will allow PJI to enter the Premises, without being guilty of trespass and without incurring any liability to Lessor, to remove all signs and other items identifying the Premises as a Papa John's restaurant and to make such other modifications as are reasonably necessary to protect PJI's proprietary marks and the Papa John's System, and to distinguish the Premises from Papa John's restaurants.  Provided, however, that this obligation of Lessor shall be conditioned upon PJI giving Lessor prior notice of the modifications to be made and the items to be removed.

5.      **Consideration; No Liability**.

(a)      Lessor hereby acknowledges that the provisions of this Addendum to Lease are required pursuant to the Franchise Agreement under which Lessee plans to operate its business and that Lessee would not lease the Premises without this Addendum.

(b)      Lessor further acknowledges that Lessee is not an agent or employee of PJI and that Lessee has no authority or power to act for, or to create any liability on behalf of, or to in any way bind PJI or any Affiliate of PJI, and that Lessor has entered into this Addendum to Lease with full understanding that it creates no duties, obligations or liabilities of or against PJI or any Affiliate of PJI.

6.      **Amendments**.  No amendment or variation of the terms of this Addendum to Lease shall be valid unless made in writing and signed by the parties hereto.

7.    **Reaffirmation of Lease**.  Except as amended or modified herein, all of the terms, conditions and covenants of the Lease shall remain in full force and effect and are incorporated herein by reference and made a part hereof as though copied herein in full.

8.    **Affiliate**.  As used in this Agreement, the term "Affiliate" shall mean any person or entity that is owned or controlled by PJI or which owns or controls PJI or is under common control with PJI, directly or through one or more intermediaries.

**IN TESTIMONY WHEREOF,** witness the signatures of the parties hereto as of the day, month and year first written above.

By: _____

Title: _____

("Lessor")

By: _____

Title: _____

("Lessee")

A-3

**PAPA JOHN'S**

**FRANCHISE AGREEMENT**

<u>**EXHIBIT B**</u>

<u>**ASSIGNMENT OF TELEPHONE NUMBERS AND LISTINGS**</u>

      **THIS ASSIGNMENT** is entered into this ___ day of _____, 20___, in accordance with the terms of that certain Papa John's International, Inc. Franchise Agreement (the "**Franchise Agreement**") between _____ ("**You**") and Papa John's International, Inc., a Delaware corporation ("**we**", "**us**" or "**Papa John's**"), executed concurrently with this Assignment, under which we granted you the right to own and operate a Papa John's restaurant located at _____ _____ (the "**Restaurant**").

      **FOR VALUE RECEIVED**, you hereby assign to us all of your right, title and interest in and to those certain telephone numbers listed below and regular, classified or other telephone directory listings (collectively, the "**Telephone Numbers and Listings**") associated with our trademarks and service marks and used from time to time in connection with the operation of the Restaurant at the address provided above.  Except as specified herein, we shall have no liability or obligation of any kind whatsoever arising from or in connection with this Assignment, unless we notify the telephone company and/or the listing agencies with which you have placed telephone directory listings (all such entities are collectively referred to herein as the "**Telephone Company**") to effectuate the assignment pursuant to the terms hereof.

**PAPA JOHN'S INTERNATIONAL, INC.:**     **YOU:**

By: _____     By: _____
   Title: _____       Title: _____

     Telephone Numbers:

     _____

     _____

     _____

B-1